HARTFIELD v. STATE.

(In Banc. June 5, 1939.)

[189 So. 530. No. 33548.]

ETHRIDGE and McGOWEN, JJ., dissenting.

**Howie, Howie & McGowan,** of Jackson, for appellant.

**Barbour & Henry** and **Barbour & Barbour,** all of Yazoo City, for appellant.

W. D. Conn, Jr., Assistant Attorney-General, for the
State.

Argued orally by **J. H. Howie** and **J. F. Barbour**, for appellant, and by **W. D. Conn, Jr.**, for the state.

**McGehee, J.**, delivered the opinion of the court.

From a conviction on a charge of murder and sentence of death, this appeal is prosecuted.

The appellant, Jack Hartfield, who was serving a life term in the state penitentiary, and who had been a trusty there for more than ten years, accompanied the Superintendent, as chauffeur of his automobile, on a trip to Jackson on March 22, 1938. On that evening, he met another life term convict, R. B. (Happy) Davis, who had been to Mobile, Alabama, serving as chauffeur of the traveling sergeant and assisting him to recapture an escaped convict. Hartfield and Davis had known two former convicts in the penitentiary, Carl Bailey and Roy Livingston, who were living in Jackson on the occasion in question. Instead of staying in their rooms that night, or within the vicinity thereof, these two trusties took occasion to go wherever they saw fit. Their chance for association being limited, they naturally sought the companionship of their two former acquaintances, Bailey and Livingston. These four men then went to the "Gold Coast," got some whiskey and drank it, rode about the city awhile and finally arrived at the night club known as "Tom's Tavern," where the fatal difficulty occurred. The deceased, Ray Grant, had also visited the "Gold Coast" and one other "night spot" where he had bought and drunk some whiskey before he went to

"Tom's Tavern". He and his associates, Mac Hoover, Misses Billie Downs, Katherine Wright and Bobbie Moore, arrived at the tavern shortly before the defendant Hartfield and his associates did, and it is shown by a witness for the State that the deceased, Ray Grant, took one or more drinks of whiskey after arriving there. The defendant was sitting at a table in a corner of the dance hall, in company with Davis and Livingston, when his other companion, Carl Bailey, became involved in a difficulty provoked by one Dallas Kirsh, a friend of the deceased Ray Grant and his companions. Thereupon, the deceased and Mac Hoover got into the fight against Carl Bailey, and were getting the best of him, in what the witnesses for the state designated as a "free for all" fight, while the defendant and his two companions were still seated at their table. Upon the appellant's attention being called to the fight, it is claimed that he said: "We can't afford to have such a commotion as this here, not us", and went to where the fight was in progress. It does not affirmatively appear that he became the aggressor as against any of the participants in the fight. It is not claimed that he struck the deceased Ray Grant or any other named person who was then engaged in the difficulty. If he struck any blow with his fist, it does not appear from the testimony that he did so as an aggressor. If he struck any blow defensively, and it does not appear that he did so otherwise, then such action would not have been inconsistent with his announced purpose and intention of trying to stop the fight. It does appear however that, almost immediately after he went to where the fight was in progress, he was seen lying on the floor being stamped in the face by the deceased while others had him down; and there is no conflict whatever in any of the testimony to the effect that the defendant's face was bruised and bleeding immediately before the fatal encounter. Three eye-witnesses for the state so testified; the others did not assert the contrary. Moreover, five additional witnesses for the State, including the officers

who arrested the appellant, testified as to having observed shortly after the killing that the appellant's face had been bruised and was bleeding. Witnesses for the defense say that when they succeeded in stopping the deceased from stamping the appellant in the face and kicking him about the head, it was necessary to assist the appellant to his feet; and that he then staggered against the wall and on out of the dance hall in a "goofy" or half dazed condition. These facts are not disputed by any witness. There is no contention that the appellant's dazed condition was due to drunkenness. Neither had he displayed any weapon up to that time, nor attempted to do the deceased, Ray Grant, any harm in so far as the record discloses. On the contrary, it is shown without dispute that when Carl Bailey, a companion of the appellant, struck Dallas Kirsh, a friend of the deceased, on account of the persistency of Kirsh in trying to "break" a dance between Carl Bailey and a Miss Schaffer, contrary to the "no breaking" sign posted in the dance hall, and whereupon the "free for all" fight ensued in which the deceased and one of his companions, Mac Hoover, were participating, the appellant was still seated at the table in a corner of the dance hall; that upon his attention being called to the fight which was started when Dallas Kirsh is alleged to have torn Bailey's shirt pocket off and spilled his pencils, cigarettes, etc., on the floor in his attempt to "break" the dance as aforesaid, he arose and made the remark heretofore mentioned to the effect that "We can't afford to have such a commotion as this here, not us", and that he went to where the fight was in progress, with the result that he was knocked down by someone, assaulted and beaten by several persons, and stamped by the deceased in the manner heretofore stated.

The testimony is in conflict, even so far as the State's evidence is concerned, as to whether the appellant, after being assisted to his feet by Carl Bailey at the end of the first difficulty, went outside of the building or merely

into the bar between the dance hall and the front door, before he returned to the dance hall and inquired as to "who stamped me in the face?" or "I want to know why I was stamped in the face?" The witnesses for the State with one accord testified that the time intervening between the stamping of the appellant in the face by the deceased and the time of the fatal difficulty was between five or ten minutes; whereas, witnesses for the appellant placed the time at three or four minutes, or in a very short time. At any rate, it is undisputed that in the meantime the appellant was engaged in wiping the blood from his face and that his face was still bleeding when he came back into the dance hall. At that time Miss Billie Downs and Miss Katherine Wright, companions of the deceased, and witnesses for the State, say that they were trying to quiet the deceased, Ray Grant, and that he was saying that he could whip him (referring to defendant Hartfield), while there was testimony on behalf of the defendant that Grant was saying: "If he has'nt got enough, I will give him some more". The result was that the defendant advanced on Grant and began cutting him with a knife (which is referred to in the briefs as a small pocket-knife), and the proof shows that he continued to cut Grant, pursued him out of the building, and until he had cut him to death. The proof fails to disclose that the appellant drew his knife until after he had inquired as to who had stamped him in the face and the deceased had made the statements hereinbefore referred to.

It was therefore a question for the jury as to whether the cutting was done pursuant to a previously formed design, or in the heat of passion. That is to say, the issue of whether or not sufficient time had elapsed between the stamping of the appellant and the cutting of the deceased for passion to subside and for reason to resume its sway was a question of fact for the jury. The trial court assumed that the jury had the authority to decide the issue of manslaughter or murder and to return a verdict according to its finding in that belief, when the instruc-

tions to the jury on behalf of the appellant on the question of manslaughter were given. Notwithstanding that this was the right and province of the jury, we find that the prosecuting attorney, in his argument to the jury, made the following statement: "Now gentlemen, we come to the question of punishment. You should not bring in a verdict of manslaughter or a life sentence. What is the use of sending a man to the penitentiary for life, because he is already there under a life sentence, and anything less than the death penalty would not be any punishment in this case." Upon objections being made by the appellant's counsel, coupled with a request that a mistrial be entered, the trial court, without any desire or intention to prejudice the rights of the appellant, made what he erroneously conceived to be a proper and legitimate comment, in the hearing of the jury, as follows: "In view of the fact that the jurors have two matters to decide, one the guilt or innocence of the defendant and the other the nature of the punishment in case of guilt, I do not think the argument is outside the proprieties".

Objections were thereupon made to both the argument of the attorney and the comment of the court, which were embodied in a bill of exceptions duly signed by the court, containing the two statements hereinbefore quoted, but the prosecuting attorney was allowed to pursue the same line of argument thus objected to. It will be observed from the language used by the prosecuting attorney, that his statement was not limited merely to the punishment in the event the jury should find the defendant guilty of murder. It advised the jury that neither a manslaughter verdict, nor a life sentence, should be returned. His statement presupposed that the jury might believe the defendant only guilty of manslaughter, and then cautioned the jurors in effect that even though they should so believe, it would be useless to return that verdict, or any other verdict less than the death penalty. To advise the jury, with the approval of the court as being within the proprieties, that a verdict of manslaughter or a life

sentence would be equivalent to no punishment at all could have no other possible effect than to inform the jurors that it was immaterial whether they believed the defendant guilty of manslaughter or murder, since the proper and only punishment in either event was asserted to be the death penalty. We do not mean to say that a prosecuting attorney is not entitled to appeal for the death penalty in the event of a conviction of murder, when such argument is based on the particular facts of the instant case, but we are of the opinion that it was improper that such argument be based upon the fact that the appellant was then serving a life sentence in the state penitentiary, or to contend that a verdict of manslaughter or a life sentence would not be any punishment because of that fact. To say that a man should be punished only by death, even though the jury should honestly believe that under the evidence a verdict of manslaughter should be returned, and notwithstanding the fact that the law of the State fixes the maximum penalty for manslaughter at twenty years in prison, is equivalent to asking the jury to disregard the legal rights of the accused which entitled him to have the grade of the offense determined by the facts alone of the particular crime for which he was then on trial, without regard to whether or not he was then serving a life sentence. That question had nothing to do with the issue of whether the verdict should be manslaughter or murder.

In the case of Windham v. State, 91 Miss. 845, 45 So. 861, 862, the defendant was on trial for murder and the prosecuting attorney urged in his argument to the jury that the judge could, in his discretion, punish the defendant if convicted of manslaughter either by a fine and imprisonment in the county jail, or by a term of years in the penitentiary, and this Court held: ''In a case like this such language was wholly inadmissible. It was a very plain bid for a conviction of manslaughter, under the indictment for murder, and the jury accordingly so found''. In the case at bar, the argument was a plain bid

for the death penalty, without regard to whether the defendant was guilty of manslaughter instead of murder. It was likewise held to be reversible error on a charge of murder in the case of Minor v. State, 101 Miss. 107, 57 So. 548, for the prosecuting attorney to say to the jury, "If you bring in a verdict of manslaughter, the court does not have to sentence [the defendant] to the penitentiary, but can find her or send her to the county farm". Moreover, it has even been held improper for a defendant's counsel to argue on a murder trial that "We do not want the jury to bring in any manslaughter verdict; that the district attorney had asked for a manslaughter, and the state would be tickled to death to secure a verdict of manslaughter, and send this man to the pentitentiary for a term of years". Springer v. State, 129 Miss. 589, 92 So. 633, 634. If it be true, as this Court has held in the Windham and Minor cases, supra, that it is reversible error to tell a jury what punishment can be imposed by the court in the event of a conviction of manslaughter, then most assuredly it should constitute such error for the jury to be told that there is no use for it to return a manslaughter verdict, or for a life sentence, on the asserted ground that in such event the court could not punish the defendant at all. If it is prejudicial to inform the jury as to the extent of the punishment fixed by law in a case where a manslaughter conviction is permissible, then certainly it is prejudicial to tell the jury, contrary to the law, that such a conviction would carry no punishment at all in the instant case.

Under the general rule, to which there are certain well recognized exceptions, it would not have been competent for the State to prove that the appellant was serving a life sentence in the penitentiary. Wharton's Criminal Evidence, Fo. 1, section 337, states the general rule to be that: "When a defendant has voluntarily put his character in issue, it is neither competent nor relevant to the issue to admit in rebuttal, on the part of the prosecution, evidence of independent facts, or acts of misconduct.

The rebutting testimony should relate to bad reputation." Also, Wigmore on Evidence, Vol. 1, page 269; Bird v. United States, 180 U. S. 356, 21 S. Ct. 403, 45 L. Ed. 570; Kearney v. State, 68 Miss. 233, 8 So. 292; and Neal v. State, 101 Miss. 122, 57 So. 419. If the appellant, Hartfield, had offered himself as a witness, which he did not do, then proof of the fact that he had been previously convicted of a crime (but not the extent of the punishment imposed) would, under section 1532 of the Code of 1930, have been competent to affect his credibility as a witness. The defense had succeeded in keeping from the jury the wholly irrelevant, but highly prejudicial, fact that the defendant was serving a life sentence until one of the prosecuting attorneys succeeded in getting the fact to the jury in his own statement embodied in a question to the witness, Mr. O. G. Tann, who had known the defendant for seven years as a "trusty" in the state penitentiary, as follows: "Q. You never knew him at all, except as a convict in the state penitentiary, who was committed there for life, did you? A. No, sir. Q. That is the only way you ever knew him, the only capacity you ever knew him in? A. That's all." It will thus be seen that the answer of the witness would have been the same if there had been omitted from the question the words "who was committed there for life". He was being examined as to the extent of his acquaintance with the defendant, and the extent of the time that he has yet to serve as a prisoner had nothing to do with the inquiry. The argument to the jury for the death penalty approved by the court as being within the proprieties, and based on the fact that the accused was a life term prisoner was not a proper argument, for the reason that the jury was entitled to determine both the grade of the offense and the extent of the punishment on the facts of the case then being tried. Martin v. State, 63 Miss. 505, 56 Am. Rep. 813; Long v. State, 81 Miss. 448, 33 So. 224; Evans v. State, 98 Miss. 697, 54 So. 154, Ann. Cas. 1913B, 257; Newman Lbr. Company v. Norris, 130

Miss. 751, 94 So. 881; Bufkin v. State, 134 Miss. 116, 98 So. 455; Smith v. State, 141 Miss. 772, 105 So. 758; Roney v. State, 153 Miss. 290, 120 So. 445.

In view of the fact that some of the witnesses stated that "Happy" Davis pointed out the deceased to the appellant, Hartfield, after the first difficulty, and others testified that this was done by Carl Bailey, we are unable to say that it was error for the grand jury to indict them as being present aiding, abetting and encouraging the commission of the fatal assault. There was also proof that the witness Mac Hoover was prevented by someone from stopping the second fight in which the cutting occurred. We are not advised as to what other information the grand jury may have had as a basis for such indictments, since there were witnesses present at the scene of the crime who did not testify at the trial, and who may have testified before the grand jury. Therefore to hold that the indictment of these two witnesses of the accused was not error is not in conflict with the cases of Turner v. State, 168 Miss. 452, 151 So. 721; and Smith v. State, Miss., 183 So. 699.

Other errors are assigned, but we deem it unnecessary to discuss them for the reason that the cause must be reversed and remanded, and these alleged errors would not likely re-occur upon a new trial of the case.

Reversed and remanded.

**Griffith, J.,** disqualified, took no part in the cause or decision.

**Ethridge, J.,** delivered a dissenting opinion.

J. H. Hartfield, the appellant, was indicted at the May Term, 1938, of the Circuit Court of the First District of Hinds county, Mississippi, for the murder of Ray Grant, and on motion for a change of venue the cause was transferred to the Circuit Court of Yazoo county, where it was tried at the October, 1938, term, and the appellant was

convicted and sentenced to be hanged; from which sentence this appeal is prosecuted.

At the time of the commission of the crime for which he was tried, the appellant was a trusty in the state penitentiary. He had come to the City of Jackson as chauffeur for one of the officers of the state penitentiary, and was permitted to go to a hotel in the city. Another trusty of the state penitentiary, R. B. (Happy) Davis, was also in the city, acting as chauffeur for another officer of the penitentiary. Hartfield and Davis got together, and met another man, an ex-convict named Roy Livingston, who had been in the penitentiary with Hartfield and Davis, who invited them to supper at his residence. Livingston was working for Carl Bailey, also a former convict, out of the penitentiary on parole or on a suspended sentence. The parties all got together, and went about the city in Bailey's car, the latter having a garage, at which Livingston was employed. They drove across the river into Rankin county, to the area known as the "Gold Coast," where they purchased a half pint of liquor. After riding about the city for a while, about half past ten or eleven o'clock they went to a road house on the highway from Jackson to Yazoo City, known as "Tom's Place," which, according to the testimony, was a place where cold drinks were served, and dancing was indulged in. Hartfield, Davis, Livingston and Bailey went to this place, and according to the testimony, ordered cold drinks and were sitting at a table, when a blonde lady asked Bailey to buy her a bottle of beer, which he did, and they then went upon the floor and were dancing, when a man named Dallas Kersh undertook to break in the dancing. According to the evidence of Kersh, Bailey first told him they were not breaking, and on a second attempt by Kersh, knocked him down.

There were a number of people in the dancing hall at this time. In company with Kersh were Ray Grant, Mac Hoover, and three ladies from the city of Jackson. Several people became involved in the fight, which developed

into what is described by the witnesses as a "free for all," the number engaged therein ranging from five to ten or twelve, according to the testimony, including Davis and Hartfield. In the course of the fight Hartfield was knocked down on the floor, and was either kicked or stamped in the face by someone.

This road house was operated by a Mrs. Rizzutto, who was assisted by Miss Eva May Ainsworth. It appears from testimony on behalf of the state that Mrs. Rizzutto and Miss Ainsworth put some of the parties to the fight out, and that others left the room when the fighting occurred; Hartfield, Bailey and Davis going out or being put out. Whether Livingston was out is not clear, though he testified that he never left the building, and that Davis did not leave. However, Mrs. Rizzutto and Miss Ainsworth testified that after Hartfield, Davis and Bailey were out of the building Miss Ainsworth locked the door to prevent those who had engaged in the fight from re-entering. According to these witnesses, within five or ten minutes Hartfield, Davis and Bailey returned, and wanted to get into the building, and Mrs. Rizzutto told them that they could not come in if they intended to fight, or words to that effect. Miss Ainsworth's testimony upon this proposition is as follows: "Now, after these men went out, what, if anything, did you do?" "Well, I locked the door after they all went out." "Did they go entirely out of the building?" "Yes, sir." "And you locked the door?" "Yes, sir." "What door was that?" "The front door." "Then, after that, what happened? What did you lock the door for?" "Because I didn't want them back in; I was afraid they would start another fight." "Then what happened?" "Bailey came back to the door, and he wanted to come in, and I opened the door, and I told him he couldn't come in, and he said they had all shook hands and made friends on the outside." "Had Ray Grant been on the outside?" "No, sir; but there was several in the fight; they were all out there, and he told me—we stood there and talked—and he said

'Well, if you won't let me in, could I go in the dance hall and pick up the papers and pencils,' and some things he had lost out of his pocket during the fight. So we talked a few minutes, and I opened the door and let them come back in, because they all seemed to be in a good humor and wasn't mad, and I let them on back in.'' "Then who came back in?" "All of them that was out." "Well, did Jack Hartfield come back in?" "Yes, sir." "Carl Bailey?" "Yes, sir." "Happy Davis?" "Yes, sir." "Well, then what happened?" "Well, Davis was standing over close to the table where they had been sitting, and I was standing by the side of Bailey in the middle of the floor, with him, while he was picking up his stuff out on the floor, and Hartfield said, 'Who kicked me?'" "That's Jack Hartfield here?" "Yes, sir." "He says 'Who kicked me in the face?' And Happy Davis walked from the table where he was standing, very close to where Hartfield was standing, and he says, 'You want to know who kicked you in the face?' And he says, 'Yes.' He pointed to Ray Grant and says, 'He is the guy that kicked you in the face.' And Mrs. Rizzutto, the owner of the place, walked up and said something to him, and he said, 'You ain't seen no fighting yet; you are just fixing to.' . . ." "And then what happened?" "The next thing I knew, he had Ray Grant and was cutting him." "Now, at the time he made that statement, and just before that, what, if anything, was Ray Grant doing to Hartfield, or to anybody?" "Well, if he was doing anything, I didn't see it." "Did you see him?" "During the first fight, I don't know whether I saw him or not." "I am talking about after the first fight was over and you had unlocked the door and let these people back in there, then, when Hartfield made the statement —?" "Grant was standing up aside of the post, wasn't doing anything." "Did he have his face or back towards Hartfield?" "From where I was standing, it looked to kinder in the side, I would say." "About how far apart were they?" "Oh! just about as far as from here to Mr.

Manship, I reckon.'' . . . ''That's about ten or twelve feet, is it?'' ''Yes, sir.'' ''Now, what did Hartfield then do?'' ''He caught him and went to cutting him.'' . . . ''Now, how did he take hold of Grant, if you know?'' ''He kinder caught him under his coat, from the back like, under his coat, and put his hand around under— kinder on his stomach like.'' ''State to the jury whether or not Grant had any weapon at that time, or was attempting to do anybody any harm at the time?'' ''He didn't have it in his hand.'' ''Did he have it anywhere?'' ''I didn't see it.'' ''Was he attempting to do Hartfield or anybody any harm at that time?'' ''No, sir.'' ''What did Hartfield do to him?'' ''When he cut him he cut him in the side like.'' ''Then what happened?'' ''I don't know just how Grant—he either fell or Hartfield knocked him down, as to which I don't know, and he kinder crawled—Grant kinder crawled and got up and started to run; he ran out of the dance hall into where the checking counter was, and he kinder fell over that counter there, and Hartfield cut him again.'' ''Now, what did Hartfield do when Grant crawled out and got up and ran?'' ''Hartfield ran after him.'' ''What did he do then?'' ''Cut him on this checking counter, and Grant ran out the front door, and just as he got on the outside of the door Hartfield cut this side of his coat off, and it dropped down there.'' ''What was Grant doing all this time?'' ''He was running.'' ''Then, after he cut this part of his coat off, what happened?'' ''He ran across the road, across a vacant lot, and ran to the back.'' ''And what did Hartfield do?'' ''He was running after him.'' ''Did you see any more of Grant?'' ''Not until about ten or fifteen minutes later.'' ''Where did you see him then?'' ''He was laying down by the trailer back of a house over there, and I struck a match and saw that he was all cut to pieces, and I came back to the place, and Mrs. Curran had come over at that time, and she asked Mr. Burkitt—.'' ''You needn't state any conversation that occurred there, unless Hartfield

was present. He wasn't present?'' ''No, sir.'' ''Then Grant was removed from the place, was he?'' ''Yes, sir.'' ''Now, what happened to Hartfield? Did you see him any more after you saw him running Grant through the field there?'' ''Not until we were down at police headquarters here that night.'' ''After Hartfield attacked Grant there and caught him the first time in the dance hall, what, if anything, did you hear said by anybody?'' ''During the time——'' ''Yes, Did Grant say anything?'' ''The only thing I heard him say was, 'Mack, they are cutting me.' ''

Mrs. Rizzutto testified upon this proposition. After testifying as to the place, and the visit of the defendant with his companions, and serving them cold drinks, she testified as follows: ''Now, after that was there or not any commotion in your place?'' ''Well, they ordered beer about twice, I think—had the second round of beer, and Carl Bailey was dancing with one of the girls, Vera Shaeffer, and Kersh tried to break, and that started a free-for-all; but I didn't see much of that; I was standing at the front looking at it, but don't know how it started.'' ''You were not close enough to know what took place between Bailey and Kersh?'' ''I didn't hear the trouble between them, but I asked how they started it, and they said he tried to break.'' ''Now, when Bailey and Kersh started to fighting, what happened?'' ''It wound up in a free-for-all.'' ''The whole crowd started fighting?'' ''Yes, sir.'' ''At the time Carl Bailey and Kersh started to fighting, where was Jack Hartfield?'' ''At the table. He came from the table.'' ''Where did he go?'' ''When I seen him, he was standing out in the middle of the floor.'' ''Was that near the place where Bailey and Kersh were fighting?'' ''Yes, sir; right near.'' ''State to the jury whether or not Hartfield then got into the fight himself?'' ''Well, they all got into it, the best I could tell, everybody was fighting.'' ''And where did that fight occur?'' ''Right in the middle of the dance hall.'' ''Now, after the first fight was over, what

took place?'' ''Well, when they got them separated, everybody quit, Carl Bailey, and Roy Livingston, and Happy Davis, and Hartfield went outside.'' ''The four went outside?'' ''Yes, sir; they went out.'' ''Did any others go out too?'' ''Some went out ahead of them, but they came back and started dancing again.'' ''At the time they went out others went out too?'' ''Others went out ahead of them and after too.'' ''After they went out, what, if anything, happened with reference to the door?'' ''Well, Miss Ainsworth said to me, 'Let's lock the door and don't let them back.' '' ''Was the door locked?'' ''Yes, sir; she locked the door.'' ''At that time, where was Ray Grant and his group?'' ''In the dance hall.'' ''Did they ever leave?'' ''No, sir.'' ''How long did these men remain outside?'' ''Between five and ten minutes.'' ''Did you or not have any conversation with them at the time when they attempted to get back, or did you hear a conversation between them with anyone?'' ''They started back in and I met them and asked them not to come in; I says 'You all have caused enough trouble, and I don't want any more,' and Carl says, 'You needn't worry, there will not be any more trouble; we had enough.' I says, 'If you want to come in and enjoy yourselves, come in; if not, stay out.' He assured us there would be no more trouble.'' ''And you let them in?'' ''Yes, sir.'' ''State to the jury whether or not those four came in together?'' ''They did; all of them came in together.'' ''Where did they go?'' ''Back in the dance hall.'' ''Tell the jury what occurred after they got back in the dance hall?'' ''They walked in the dance hall, and Jack Hartfield says—I heard him say—'Who was that kicked me in the face?' '' ''That was this defendant?'' ''Yes, sir. So I went in and told him we didn't want any more trouble. Some of them spoke up—and he started rolling up his sleeves, and pulled his tie off. He says, 'You haven't seen any fighting to what you are going to see.' Some pointed out and says, 'It is that boy with the brown suit on.' '' ''Who

did he point towards?'' ''Ray Grant.'' ''Where was he at that time?'' ''Standing about the center of the hall at a post.''· ''How far was he from Hartfield at that time, approximately?'' ''I would say about as far as to that little gate there—just across the hall.'' ''Ten or twelve feet?''· ''Yes, sir; just across the hall.'' ''Was Ray Grant facing Hartfield at that time?'' ''No, sir; standing propped against the post.'' ''With his face or back towards Hartfield?'' ''More sideways than any other way.'' ''Had he addressed any remarks to Hartfield or said anything to anybody?'' ''No sir, he wasn't talking to anybody but Mack Hoover and the girls.'' ''When you went up and spoke to Hartfield, what was it Hartfield said?'' ''He told me I hadn't saw any fighting to what I was going to see.'' ''What did he then do?'' ''He rolled his sleeves and pulled his tie, and put his hands in his pocket, and he was walking across the floor.'' ''What did he have in his hand?'' ''He had his knife in his hand when he took it out of his pocket.'' ''Was that knife open or closed?''· ''Yes, sir; open.'' ''What did he do?'' ''He rushed across the hall and grabbed Grant.'' ''At that time he grabbed Grant, and just before he grabbed Grant, tell the jury what Grant was doing to him, or anybody else?'' ''Wasn't doing anything but standing talking to them boys and girls.'' ''Did Grant have any weapon in his hand you could see?'' ''No, sir; was standing back—I don't suppose the boy knew he was coming after him.''

By counsel: ''We object to what she supposed.'' Court sustained objection.

''Was Grant looking at him?'' ''Grant wasn't looking at him.'' ''Did he do anything to indicate that Hartfield—that he knew Hartfield was coming after him?'' ''No, sir.'' ''You say Hartfield grabbed him. What then happened?'' ''He ran his arm around him, under his coat, and Grant hollered and says, 'He has cut me.' By that time they all got up around him, and they went down on the floor, and when they got scattered out—''.

. . . "Then what happened?" "They fell down on the floor." "Then what happened?" "Well, the people all got around them, and you couldn't see what was going on. And then he got up." "Who got up?" "Grant and Hartfield." "Where did Grant go?" "He started running across the dance hall, and Hartfield had him by the coat cutting at him as he was going across the dance hall." "What was Grant doing?" "Running." "What happened then?" "He ran into the checking room, and he got him over the counter, and he cut him there two or three times." "Who cut who?" "Hartfield cut Grant." "And what was Grant doing?" "Laying over the counter." "Then what happened?" "Finally they all ran out, and most everybody ran out, and so I went there, and I thought I might be able to pull him off of him, and he shoved me through a door and Grant raised up and he cut him again; I fell between Grant and Hartfield, and so Grant ran out of a door and I went behind him and Hartfield came behind me and went off across the building and out at the front door. Grant started running again and Hartfield ran around me and, just like this—cut him, just like this, just as he got out of the door." "What, if anything, happened to his clothing there?" "The corner of his coat fell off on the ground, and I picked it up." . . . "Then, after that, what did Grant do?" "He ran on across the front, and ran into the back of a car." "What did Hartfield do?" "He was running behind him." "Now, tell the jury, please, Ma'am, what is the last you saw of Grant and Hartfield?" "When he ran into the back of the car Hartfield was going toward him." "All right; what else?" "So, he ran around the back of the car over across the road, and Hartfield was running behind him, was the last I saw of the two."

The testimony is voluminous, and it would be impossible to go into detail in regard to all the testimony given by witnesses in the case. But the testimony of these two women is corroborated in many aspects by all

the witnesses, save the defendant and his three companions, who also testified. In the first fight no one saw Hartfield when he entered the conflict, and no one saw what anyone did to him, if anything, to involve him in the fight.

Happy Davis, testifying for the defendant, said that after they went in the house they sat at the table and drank cold drinks; and that a blonde lady came up and asked Bailey to buy her a drink, which he did, and they then began to dance. He was asked: ''Had there been any disturbance on the floor of any kind up to the time you say this man was knocked down by Carl Bailey?''. ''No, sir; there had been on disturbance.'' ''Did you see what caused the disturbance between him and Carl Bailey?'' ''No, sir.'' ''You were not noticing it?'' ''No, sir.'' ''When Carl knocked him down, what then happened?'' ''Well, Jack—I says; there's an awful fight.'' Hartfield's back was to the crowd; and Jack got out of his seat, and he says, ''We can't have no commotion like this out here, not us;'' and he started to where Bailey was, and that when the whole fight begun.'' ''Did you see anybody attack Jack, or Jack attack anybody?'' ''I couldn't tell, because the lights were low, and from where he was, there was so many people between me and him, I just noticed that there was a big gang around together.'' ''What did you next see with reference to Jack?'' ''The next thing I saw, was Hartfield over on the floor, over by this nickelodeon.'' ''What was being done to him, if anything?'' ''There were four or five men on him, stamping him.'' ''Did you not afterwards find out any of those men that were on him?'' ''Yes, sir.'' ''Which of the men that were on him did you afterwards know or find out who they were?'' ''Well, I didn't know any of them except Grant, was the only one that I recognized, and Hoover.'' ''What was Grant doing, if anything, when you looked and saw Jack on the floor?'' ''Well, Bailey was pulling Grant off of him; he was pulling him away from Jack when I

saw Grant.'' ''Did you see Grant do anything to Jack?'' ''Yes, sir.'' ''What did you see him do?'' ''Saw him stamping him.'' ''What part of his body?'' ''His head.'' ''How was Jack laying at the time Grant stamped him, on his face, back, side, or how?'' ''Yes, sir; he looked like he was kinder laying over on his side, and he tried to turn over, it seemed like.'' ''It looked to you like he tried to turn over?'' ''Yes, sir.'' ''And after Bailey pulled Grant off, what, if anything, was done to Jack?'' ''Bailey just reached down, and Jack was trying to get up, and he raised him up on his feet.'' ''What was his condition when he raised him up?'' ''He was dazed; he was off.'' ''Was he standing on his feet or not?'' ''Yes, sir; he was on his feet, but kinder staggered like.'' ''Then, after he pulled him up, where did Jack go?'' ''He didn't go anywhere; he just started, you know, to rubbing his face, like that, to try to get the blood and stuff out of his eyes and straighten up, and he was still in a dazed condition.'' ''Where did you go then?'' ''I didn't go anywhere; I was right there.'' ''What part of the building did you stay in after this excitement?'' ''Well, it happened right at this nickelodeon, and there was a kind of doorway, or archway that leads out into the little bar, and we had got over to where we were standing kinder in this little archway.'' ''Who was with you in that archway?'' ''I don't know, sir, there was such a crowd around there. I think Livingston was sitting on a stool right there close to where we were.'' ''Did you notice whether he sat there, or whether he left, or not?'' ''He stayed there.'' ''Did anybody go out of the building that you noticed?'' ''Yes, sir; there was some went out of the building.'' ''Did you go out?'' ''No, sir.'' ''Did you take any part in any of that fight, any time, anywhere?'' ''No, sir.'' ''Did Roy Livingston take any part in it?'' ''No, sir.'' ''Did Bailey take any part, other than in the first trouble there with the fellow that broke them?'' ''No, sir.'' ''Did he take any part in it further than that?'' ''No, sir.''

"Now, after this part of the fight was over, and Jack was up on his feet, just go on to the jury and state, where did Jack go or where did he stay?" "From the time he got him up off of the floor?" "Yes." "Well, he kinder got up and straightened around, and kinder got the blood out of his face; and in just a short time he says, 'Who was that that stamped me like that' and there was some fellow said, 'the fellow with the brown suit on.'" "Whoever said that was near you?" "Yes, sir; they were right there." "Did you notice who it was?" "No, sir; I didn't." "You don't know who it was?" "No, sir." "But he was near you?" "Yes, sir." "When that was said, what happened?" "Strike that question. When Jack asked that question, where was Ray Grant?" "Ray was standing about, I will say six feet—five or six feet from Jack, with some more people there with him." "Did he say anything when Jack said that?" "He says, 'If he hasn't got enough I will give him some more.'" "Then what happened?" "They just run together; and when they run together there was some fellow grabbed me on my right shoulder and wheeled me around from them to where I couldn't see what was going on." "Do you know who did that?" "No, sir; I found out who it was afterwards; didn't know them." "Who did you find out it was?" "Hoover." "Grabbed you by the shoulder and wheeled you around?" "Yes, sir." "Then what did Jack and Grant continue to do, if anything?" "I couldn't tell; I couldn't say." "Did you see them any more after that fellow jerked you around?" "No, sir; didn't see them any more." "Did you see them when they went out of the room?" "No, sir." "Did you see them on the outside after they ran out?" "No, sir; that's all I seen."

There was a considerable difference in some of the statements of the numerous witnesses who testified in the case; but they all testified that after Bailey struck Kersh the fight became general; except that it was stated by one of the witnesses for the defendant that when

Bailey knocked Kersh down, the latter got up, laughed and shook hands. This witness stands alone on that statement, the rest testifying that there was a general fight, and that Mrs. Rizzutto and Miss Ainsworth were trying to separate the combatants, and end the fist fight. Practically all testified that after Bailey and Hartfield and Davis returned to the room, Hartfield asked, "Who was it that stomped or kicked me in the face?" and somebody said, "The man in the brown suit;" and that man was Grant; that Hartfield rushed upon him, they clinched, and Grant cried out, "He has cut me!"; that they then fell to the floor, and Grant got up and began to run, with Hartfield in pursuit, cutting him, and ran him outside of the building. There were several witnesses to the effect that Hartfield continued to pursue and cut him, as far as the witnesses could see. After which Hartfield disappeared, and Bailey, Davis and Livingston returned to town, Davis to the Heidelberg Hotel, where he was dropped, Bailey and Livingston going on, presumably to their places.

After the cutting Hartfield went to a store a short distance away, belonging to M. B. Houston, and appearing in the doorway, asked him to telephone for a taxi for him, which Houston did. He testified that Hartfield's face was bloody, and that on being asked what the trouble was, stated that he had been in a car wreck. When the taxi came Hartfield rode away in it, going to the Heidelberg Hotel. On getting out of the taxi at his destination Hartfield asked the driver not to say anything about carrying him there. He then went to Davis' room, and was in the bathroom when the policemen arrived in search of him, but not knowing who he was. They asked Davis, "Where is that man?", who replied, "He is in the washroom," and when they called him to come out he did so; whereupon they arrested him for murder. On being asked who he was he stated that his name was John Lowe, from Hattiesburg. Although present when Hartfield made this statement, Davis made no correction of it. The

policemen took Hartfield to the police station, and later Davis, Bailey and Livingston, and other witnesses to the fight, were brought to the police station, and questioned with reference to the matter. Hartfield signed the police register as John Lowe; and Thornhill, traveling sergeant of the penitentiary, came to the police station and identified him. The examination of the various parties at police headquarters was continued practically throughout the remainder of the night, beginning around 1:30.

The substance of the statements were reduced to writing by some of the police officers, each statement being signed, and witnessed by some of the officers. The statement made by Davis was used in cross-examining him; and he admitted signing it, but said the statements made in it were incorrect—that he did not state the matter therein contained in the sense in which it was there written. Mr. Thornhill, the traveling sergeant for whom he acted as chauffeur, was present and witnessed his statement, and told Davis he considered it all right.

The evidence of the two policemen who arrested Hartfield, introduced in chief by the state, was to the effect that they arrested Hartfield; that he gave them a false name, and signed the register at the police station with the assumed name; but that Mr. Thornhill identified him. Hartfield was also identified as a convict in the penitentiary by Davis, Bailey and Livingston, each of whom admitted having been in the penitentiary, and that they had known each other there. Bailey and Livingston came from the same city, Clarksdale, to Jackson, and Bailey was operating a garage, where Livingston worked for him.

The testimony of the witnesses for the defendant, like that of the witnesses for the state, varied in some particulars, while tending to the same effect. The defense introduced Mrs. W. A. Montgomery, former trustee of the penitentiary, who had used Hartfield as a chauffeur; and a Mr. Allen, who had been a sergeant in the penitentiary

prior to 1933, and had again served in that capacity since 1936; and O. G. Tann, who had first been a sergeant in the penitentiary and was afterwards superintendent, and later on served as manager. All of these testified to the fact that Hartfield had a good reputation for peace among the people with whom he associated in the penitentiary, and that he had been used for many years as a trusty, during which time no complaint had been made of his conduct.

On preliminary examination Mr. Allen testified that Hartfield was a convict in the penitentiary, serving a life term for murder, but this appears to have been given in the absence of the jury. Mr. Tann, on being examined, gave as his testimony in chief that Hartfield had been a trusty, that he had enjoyed a good reputation for peaceful behavior while serving as a convict in the penitentiary. On cross-examination he was asked the following question by the state: ''You never knew him at all, except as a convict in the state penitentiary, who was committed there for life, did you?'', to which he replied, ''No, sir.'' And, further, ''That's the only way you ever knew him, the only capacity you ever knew him in?'' ''That's all.'' This testimony was not objected to, but it will be referred to hereafter, in the discussion of the legal propositions involved.

The witness, Davis, on cross-examination, denied many of the statements contained in the rather lengthy statement at the police office, which was written down by the policeman, Bruton, and attested by witnesses, and which were in conflict in various particulars with Davis' testimony on the witness stand.

These facts are stated rather elaborately, for the reason that it is earnestly suggested that the proof did not sustain a conviction for murder, and that at most it only sustained the charge of manslaughter, as actually made in the proof.

The second contention, to the effect that the defendant was only proved guilty of manslaughter, and that

there was no proper basis for a conviction of murder, cannot be sustained. There was an abundance of proof upon every proposition involved, measured by the law, to sustain a conviction of murder. The jury might possibly have found a verdict of manslaughter; but the jury are the triers of the facts, and the court gave instructions, liberal to the appellant, upon that subject; and also gave for the state a definition of murder and manslaughter; and instructions for the defendant—a number of them—assumed that if the appellant were aroused to a high degree of passion in the fight, that this alone would reduce the killing to manslaughter.

There was no definite proof as to how or when the appellant got into the first fight, but he did go into it, and there is no proof that he was first assaulted by anyone. The inference may be reasonably drawn from the facts shown that he went into the fight because his friend and associate, Carl Bailey, was being worsted in the fight which Bailey had started. There is no proof to show that Hartfield made any effort to persuade those in the fight to abandon it, or to act as peace-maker, or to solicit help from anybody to quell the fighting, instead of becoming a participant therein. The jury had a right to draw their own conclusions from all the evidence taken together—that is, to draw proper inferences from the facts presented; and this they did, upon what we conceive to be a proper basis of truth.

It is true that Happy Davis, in his testimony, says that when Hartfield's attention was called to the fact that the fight was going on, he said, in effect, "We cannot afford to have anything like that happen—not us!" or words equivalent to that; then got up and proceeded in the direction of the fight. Davis did not see him when he became involved therein, nor did he witness or hear any act committed against Hartfield by anyone, until he was engaged in the fight, down and being stamped. Davis is impeached in many ways; he denied many material statements made at police headquarters, contained in

the written statements taken by police and signed by him, and witnessed by officers; and the testimony clearly shows that such statements were made without coercion, intimidation, or promise of reward. No one seems to support Davis as to what Hartfield said, nor does the statement of itself indicate what action he contemplated taking to stop the fight, or whether or not he intended to stop it. But after this first fight was over, and after there was time for Hartfield and the others to become cool—the jury being the judge of what was a reasonable time in which to cool off—and Mrs. Rizzutto's testimony showed that they appeared to be cool, and that they stated they were satisfied and that there would be no further trouble, Hartfield, learning from his associate, Davis, who it was that "stomped" him, proceeded at once to attack the party, and cut him to death; and when Grant attempted to flee, Hartfield pursued him, continuing to cut until he was cut down. Then Hartfield, misrepresenting who he was, and what caused his bleeding face, asked Houston to get him a taxi, stating that he had been injured in a car accident, which is known to be false; and when he reached the Heidelberg Hotel he requested the driver not to disclose the fact that he had carried him there. He misstated his name and address to the police officers when his arrest was sought for the murder of Grant. This certainly would warrant the jury in finding him guilty of murder.

It was next assigned for error that the county prosecuting attorney, in arguing the case to the jury, stated: "Now, gentlemen, we have come to the question of punishment. You should not bring in a verdict of manslaughter or a life sentence. What is the use of sending a man to the penitentiary, because he is already there under a life sentence, and anything else than the death penalty would not be any punishment in this case."

On objection being made to this statement in open court, by the attorney, and a request for a mistrial and discharge of the jury, the court ruled: "In view of the

fact that the jurors have two matters to decide, one of guilt or innocence of the defendant, and the other the nature of the punishment in case of guilt, I do not think the argument is outside the proprieties.'' It is argued that the remarks of the county prosecuting attorney were improper, because the jury had nothing to do with the punishment of manslaughter, that manslaughter was a possible verdict, and a probable verdict, and that the ruling of the court was, in effect, telling the jury that the argument so made by the county attorney was a correct announcement of the law, and that the jury, by such argument by the county attorney, and such ruling by the court, was influenced to return a verdict of guilty of murder, with the extreme penalty.

We have in a great number of cases dealt with arguments of attorneys. It must be remembered that there is a marked difference between the argument of an attorney and the instruction or ruling by the court. The attorney is selected for the reason, chiefly, that having familiarity with the law, and having given attention and thought to the case, he is able to draw deductions proper to be drawn, or permissible to be drawn, or even possibly to be drawn from the evidence, as an aid to the jury, who, being men of good intelligence and sound judgment, understand the function of the prosecuting attorney. They understand that he is a partisan and an advocate, representing one side only. The attorney on the other side also is selected to draw deductions and make arguments from the viewpoint of the defendant, and answer or counteract any argument on the part of the state. A broad field is permitted in the argument. The attorneys do not have to be accurate in their conclusions, they do not have to make sound arguments—but make such arguments as they think proper, leaving the jury to judge of their worth, weight and soundness. In Bufkin v. State, 134 Miss. 116, at page 124, 98 So. 455, at page 457, in discussing the arguments of the attorney, challenged in that case, we said: ''It is next argued that the prosecuting

attorney commented upon the evidence of the defendant, and stated to the jury that the appellant's interest in the result of the trial was greater than the state's winesses; that he had a direct personal interest in the case, in that he would be sent to prison if convicted. To which argument exception was taken, but the court refused to sustain objection to this. We think it is within the privileges of the attorneys to comment upon the evidence. The very purpose of argument is to suggest conclusions that may be drawn from the evidence, which might not occur to the jury without argument, and, while the court cannot single out the defendant's evidence by instruction and comment thereon, this does not apply to the attorneys in the case. They have the privilege of commenting on the evidence and drawing inferences of deductions therefrom, and may refer to the witnesses by name. And in our opinion no error was committed in making said argument.''

In Jacobs v. State, 103 Miss. 622, 60 So. 723, 724, the court dealt with a more serious question as to argument, in our opinion, than that here involved. In that case, in the closing argument for the state, the district attorney used this language; ''Gentlemen, you have the power to bring in a verdict of guilty as charged, and fix the punishment of defendant at life imprisonment in the state penitentiary; but you have not the right to do it under the facts in this case, just as I have the power to slap an infant child down, but I have not the right to do it.'' And also stated that; ''I am becoming wedded to capital punishment. I will never accept another sentence of life imprisonment where the evidence shows the man to be guilty of cold-blooded murder. I am getting tired of penitentiaries. There is no use to send a man there. You can send a man to the penitentiary for life, and he will only stay there a short while, and be pardoned; and a dead man can't get pardoned.'' While in that case the Supreme Court condemned and reproved the district attorney for using such language, it refused to reverse

the case, holding that it could not be said that such language secured the verdict reached in the case.

In Gray v. State, 90 Miss. 235, 43 So. 289, the Court dealt with another argument made by an attorney in prosecuting a defendant. In that case, in a motion for a new trial, it was alleged that an attorney had abused the privilege of argument, and that the case should be reversed because of the attorney's argument. Among the statements set out in the opinion, 90 Miss. at pages 240 and 241, 43 So. at page 290, this attorney said: " 'He is as guilty as he can be.' " And again; " 'called him a bloody assassin'; 'that he said that the appellant was an athlete, and sprang to his feet, and shot Newt Wallace in the back of the head while he was standing . . . the ball going through him;' that he said 'that the defendant murdered Newt Wallace in cold blood, and that he called on the jury whether they will put a stop to these homicides, and that there had been three or four in his neighborhood within the last few months, committed by negroes;' and 'that the proof in the justice's court showed that the defendant had not lived with his wife for 2½ years or more,' etc. So far as the observation about his not having lived with his wife for 2½ years is concerned, the testimony in this record shows that that was true. It is also true that Jones was shot in the same difficulty. So far as the expression of opinion of the learned counsel that the defendant was guilty is concerned, he certainly had the right to state his opinion from the evidence. It is said in 2 Ency. of Pleading & Prac., p. 747, that 'just and fierce invective, when based upon the facts in evidence and all legitimate inferences therefrom, is not discountenanced by the courts.' Were Burke and Sheridan, in the impeachment of Warren Hastings, to weigh impassioned invective, warranted by the evidence, in the scales of quibbling nicety? Has any one who ever read Mr. Webster's prosecuting speech in the Knapp trial, or Mr. Prentiss' great speech in behalf of Judge Wilkinson, thought the splendid diction and the marvelous

imagery and the terrible invective not fully justified by the facts? . . . Dictrict attorneys and prosecuting counsel representing the state, so long as their addresses to the jury are based upon and justified by the evidence in the cause, are not to have an indignation justly aroused against horrible crime iced down to the freezing point by too frigid a care, lest they transgress in the use of heated language. Fancy and reason may well have their full and legitimate play, however splendid the flights of the one, and however terrible the logic of the other, if only that fancy and that reasoning exercise themselves within the scope warranted by the testimony in the case.''

But it is argued in this case that there was no evidence to warrant the reference to the defendant being in the penitentiary for life. In the record, which is set out above, the district attorney asked the witness, Tann, ''You never knew him at all except as a convict in the state penitentiary, who was committed there for life, did you?'' which was answered in the negative. ''That's the only way you ever knew him, the only capacity you ever knew him in?'' ''That's all.''

There was no objection to this evidence being introduced. Consequently, it went into the case as evidence, and it was for the jury to place its interpretation upon the language; but the inference which the jury drew, evidently, and which they had a right to draw, was that the defendant was a lifetime prisoner in the penitentiary; and that his conduct while there had been such as to form the basis of his reputation for peace or violence as testified to by Tann. It appeared in the evidence in many places, during the trial of the cause, that the appellant was a convict in the penitentiary, and this without objection.

Also, when the witness Allen was being examined as to the competency of his evidence in regard to the good character of the appellant, while being cross-examined in the absence of the jury, the district attorney proved by Allen that the appellant was a prisoner in the peni-

tentiary, convicted of murder, and serving a life sentence, there was no objection to that statement, offered before the trial judge, nor was any objection made to the question at any time, nor any motion to exclude. This was not asked when the jury returned to the trial. The query here involved was the good reputation of the appellant, Hartfield, as regards peace or violence; and the persons relied upon to establish it were officers of the state penitentiary, from whose testimony it appeared that he was a convict, had been made a trusty, and had acted as chauffeur for various officers and employes while they were engaged in the discharge of their duties; and that he was a trusty convict.

While inquiring into his character for peace or violence, seeking to prove that he had a good general reputation in that respect in the penitentiary and among the people adjacent thereto who knew him, it was permissible to inquire, not into the details of other offenses, but into the character of the offense for which he was sentenced to the penitentiary. The fact that he was sentenced for a violent crime was a pertinent fact for consideration in connection with the evidence as to his reputation for peace or violence. Certainly, no objection can be entertained as to evidence which was admitted without objection. The questions and answers in the examination of the witness Tann show that Hartfield was a life-term prisoner.

The district attorney had a right to comment on all facts admitted in evidence, and he was not required, at the close of the evidence, to enter into deliberation as to whether it was properly admitted. Having been admitted, it was subject to comment, and to such use in the case as its logical and legal value indicated.

The ruling of the trial judge on this argument, it is contended, gave legal sanction to the statement that it would be useless to give a life sentence for the murder. This is without merit, in my opinion. The trial judge is not to be the judge of the sentence and the value of the ar-

gument; if it conforms to the rules of the law he cannot control the district attorney, or any idea that he, the judge, would make a different argument were he acting as prosecuting attorney. The ruling of the judge merely indicated that the attorney was arguing within the field of permissible argument. He did not say, nor would his ruling import, that the argument was a sound argument or a proper deduction from the facts. In no manner did the judge approve the statement, other than to say that the attorney was permitted to make it, that it was within the field of advocacy to comment upon the facts of the case.

We have had many occasions to discuss the rights of attorneys and of defendants in the arguments of attorneys, and we have held in numerous cases that in the field of legitimate argument the attorney may draw his own deductions and arguments from the testimony, that he did not have to make a sound argument, and his statements, if in anywise pertinent to the evidence, are for his own consideration. In Nelms & Blum Co. v. Fink, 159 Miss. 372, at pages 382, 383, 131 So. 817, at page 820, we said:

"Counsel is not required to be logical in argument; he is not required to draw sound conclusions, or to have a perfect argument measured by logical and rhetorical rules; his function is to draw conclusions and inferences from evidence on behalf of his client in whatever way he deems proper, so long as he does not become abusive and go outside the confines of the record. Usually when the argument is considered as a whole it is found consistent and logical and frequently eloquent. Some of the greatest speeches in our history have been made within the courthouse. As has been said, the court cannot control the substance and phraseology of counsel's argument; there is nothing to authorize the court to interfere until there is either abuse, unjustified denunciation, or a statement of fact not shown in evidence. Counsel may draw upon literature, history, science, religion, and philoso-

phy for material for his argument. He may navigate all rivers of modern literature or sail the seas of ancient learning; he may explore all the shores of thought and experience; he may, if he will, take the wings of the morning and fly not only to the uttermost parts of the sea but to the uttermost limits of space in search of illustrations, similes, and metaphors to adorn his argument. He may reach the uttermost heights of attainable eloquence, soar into the empyrean heights where his shadow may fall on the loftiest mountain top, as the eagle in its loftiest flight. He may borrow from every source, modern and ancient, such materials as he needs for his argument.'' See, also, Schillings v. State, 151 Miss. 361, 118 So. 137; Stewart v. State, 170 Miss. 540, 155 So. 347; Blackwell v. State, 161 Miss. 487, 135 So. 192, 137 So. 189; Schrader v. State, 84 Miss. 593, 36 So. 385.

From a careful consideration of all matters in the record, I am of the opinion that there is no reversible error, and that the judgment should be affirmed.

**McGowen, J.,** concurs in this opinion.