# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 95-DP-01068-SCT

*MACK C. WELLS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 9-28-95 |
| TRIAL JUDGE: | HON. MARCUS D. GORDON |
| COURT FROM WHICH APPEALED: | SCOTT COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ROBERT N. BROOKS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LESLIE S. LEE |
| | MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | KEN TURNER |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY (DIRECT APPEAL) |
| DISPOSITION: | AFFIRMED - 6/12/97 |
| MOTION FOR REHEARING FILED: | 7/7/97 |
| MANDATE ISSUED: | 9/11/97 |

**EN BANC.**

**MILLS, JUSTICE, FOR THE COURT:**

¶1. Mack C. Wells was indicted in the Circuit Court of Scott County for capital murder committed while engaged in the commission of the crime of felonious abuse and/or battery of a child. The case was transferred upon motion to the Circuit Court of Leake County, where on September 27, 1995, a jury found Wells guilty as charged. After the sentencing phase of the trial, the jury recommended that Wells be sentenced to death. The trial court denied Wells' post-trial motions and entered judgment ordering that Wells be put to death by lethal injection. On appeal before this Court, Wells assigns as error the following issues.

> **I. WHETHER THE TRIAL COURT ERRED IN EXCUSING PROSPECTIVE JURORS FOR CAUSE DUE TO THEIR OPPOSITION TO THE DEATH PENALTY.**

> **II. WHETHER THE TRIAL COURT ERRED IN OVERRULING WELLS'**

**OBJECTIONS TO MISCONDUCT ON THE PART OF COUNSEL FOR THE PROSECUTION.**

**III. WHETHER THE TRIAL COURT ERRED IN OVERRULING WELLS' MOTION FOR MISTRIAL FOLLOWING THE ADMISSION INTO EVIDENCE OF THE KNIFE AS STATE'S EXHIBIT NO. 9 AND WELLS' STATEMENT CONCERNING SAME.**

**IV. WHETHER THE TRIAL COURT ERRED IN OVERRULING WELLS' MOTION FOR MISTRIAL FOLLOWING IMPROPER COMMENT ON THE EVIDENCE BY THE TRIAL JUDGE.**

**V. WHETHER THE TRIAL COURT ERRED IN OVERRULING WELLS' OBJECTION TO THE ADMISSION INTO EVIDENCE OF STATE'S EXHIBIT NO. 17 DURING THE SENTENCING PHASE OF THE TRIAL.**

**VI. WHETHER THE STATE'S CLOSING ARGUMENT DURING THE SENTENCING PHASE WAS IMPROPER AND WARRANTS A REVERSAL OF THE SENTENCE.**

**VII. WHETHER, AT THE TIME OF THE CRIME, WELLS WAS UNDER EXTREME MENTAL OR EMOTIONAL DISTURBANCE AND HIS CAPACITY TO CONFORM HIS CONDUCT TO THE REQUIREMENTS OF THE LAW WAS SUBSTANTIALLY IMPAIRED.**

## <u>FACTS</u>

¶2. During the summer of 1994, Mack C. Wells ("Wells") and Jimmy Lee Warnsley ("Warnsley") were fellow inmates, on unrelated charges, at the Forest City Jail in Scott County. While there, Wells told Warnsley that Wells was having problems with Wells' thirteen-year-old stepson, Gary Wells ("Gary"), whom Wells claimed to have overheard talking with some other boys about killing Wells. Wells told Warnsley that when Wells got out of jail, he was going to kill the boy. Wells soon was released from jail, but was incarcerated again sometime later while Warnsley was still incarcerated. Back in jail, Wells told Warnsley that while Wells had been out of jail, he had killed Gary and buried him in the backyard. According to Warnsley, Wells told him that Wells had killed Gary by stabbing him several times while Gary lay on the couch, and that when Gary asked Wells why he was doing it, Wells told him it was because Wells did not like him. Warnsley related this information to officers of the Forest Police Department.

¶3. Using this information, the officers obtained a warrant to search the premises of the Forest home of Ada Wells, Mack Wells' ex-wife and Gary's mother. During their search on October 1, 1994, the officers discovered Gary's corpse buried in a shallow grave in the backyard. The body had been dead for some time, and was wrapped in a blanket and what appeared to be a portion of a shower curtain. An autopsy later attributed Gary's death to multiple stab wounds in the neck, chest, back and hand. A search of the house revealed several knives atop the refrigerator in the kitchen and a torn shower curtain in the bathroom which later proved to match the material found wrapped around the body. The police arrested Wells the same day on the charge of murder.

¶4. During Wells' interrogation, before which he was advised of and signed a waiver of his *Miranda* rights, he made a statement confessing to the killing of his stepson. As Wells made the statement, Investigator Jimmie Nichols wrote it down, after which he read it back to Wells. Wells then read and signed the statement. Wells' statement, admitted into evidence at trial, reads as follows:

> Approx. a month ago, one day during the week on a school day I walked over to Ada's house at about 7:30 in the morning. I saw Cornelius and June and Max C. Wells Jr. on the street waiting on the bus and I asked them who was at home. I saw a blue mark on Max Jr.'s face and I asked him who did it and he said Angel. Max Jr. told me that "Man" [Gary Wells] was at the house. I went straight on over to the house. I went to the back of the house. When I got to the house I opened the door. "Man" was sitting up watching T.V. I told "Man" what was going to happen to him and his mama if they started hanging around with a bad crowd. I went to the house just to beat him up a little bit. I didn't go to kill him. "Man" pulled a knife out from under a pillow. I told him that I know that they intended on taking my life away so I don't have any choice but to take yall's to [sic]. Me and "Man" got to fighting. I took the knife and started jugging him, stabbing him. It was a long blue chicken knife. I stabbed him once in the neck and several times in the stomach. He said don't do this. I told him that I didn't have no other choice. It took Man 20 or 30 minutes to die. He was telling me that "You know your [sic] wrong." When he died I drug him into the kitchen. I started cleaning up the blood. He was still talking. I cut down the shower curtain and wrapped it around him. I also tore a blanket and put [it] over him. I took my clothes off and washed them because they were covered in blood. I took the knife and cleaned it off and put it in the rack. I then took him outside and got a shovel and dug a hole next to the back of the house and buried him. Once I took a bath and cleaned all of the mess up I took a bath and then I left.

¶5. The officers also showed Wells the group of knives found in Ada Wells' house. Wells identified the knife he used to kill Gary, which knife was admitted at trial as State's Exhibit No. 9.

### DISCUSSION OF LAW

### I. WHETHER THE TRIAL COURT ERRED IN EXCUSING PROSPECTIVE JURORS FOR CAUSE DUE TO THEIR OPPOSITION TO THE DEATH PENALTY.

¶6. Wells argues that the trial court's excusing of three prospective jurors for cause due to their opposition to the death penalty was improper because the jurors did not make it "unmistakably clear" that they would automatically vote against the death penalty, which Wells claims is required under ***Witherspoon v. Illinois***, 391 U.S. 510 (1968). However, ***Witherspoon*** does not stand for this proposition, but rather provides that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522. In fact, the Supreme Court in ***Wainwright v. Witt***, 469 U.S. 412, 424 (1985) specifically held that the ***Witherspoon*** standard "does not require that a juror's bias be proved with 'unmistakable clarity.'" *See also* ***Taylor v. State***, 672 So. 2d 1246, 1264 (Miss.) (stating same), *cert denied,* 117 S.Ct. 486 (1996).

¶7. The proper standard set forth by the Supreme Court, and followed by this Court, is whether the

juror's views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright*, 469 U.S. at 424; *Taylor*, 672 So. 2d at 1264; *Williamson v. State*, 512 So. 2d 868, 880-81 (Miss. 1987). The juror need not expressly state that he absolutely refuses to consider the death penalty, but rather an equivalent response made in any reasonable manner indicating the juror's firm position will suffice. *Taylor*, 672 so. 2d at 1264; *Willie v. State*, 585 So. 2d 660, 673 (Miss. 1991).

¶8. Because the trial judge, due to his presence during the voir dire process, is in a better position to evaluate the prospective juror's responses, the decision of whether or not to excuse the juror is left to the trial judge's discretion. *Taylor*, 672 So. 2d at 1264; *Stringer v. State*, 500 So. 2d 928, 943 (Miss. 1986). The judicial determination of whether a juror is fair and impartial will not be set aside unless such determination is clearly wrong. *Taylor*, 672 So. 2d at 1264; *Carr v. State*, 555 So. 2d 59, 60 (Miss. 1989). When reviewing the excusing of jurors due to their opposition to the death penalty, we look not only to the ruling, but also to the setting and time devoted to the questions, and the opportunity of sequestered voir dire. *Taylor*, 672 So. 2d at 1265.

¶9. In the case *sub judice*, Wells challenges the trial court's excusing of prospective jurors Hazel Harvey, Henrine Smith and Ager Beamon. In reponse to the trial judge's inquiry as to whether any prospective jurors had religious or conscientious scruples against infliction of the death penalty, these three were the only veniremen who raised their hands, whereupon the judge and all attorneys retired to chambers to question them individually. In chambers, the examinations went as follows:

**EXAMINATION OF JUROR HAZEL HARVEY BY THE COURT:**

* * *

[BY THE COURT:] Mrs. Harvey, you indicated in the Courtroom that you have conscientious scruples against the infliction of the death penalty; is that true?

A. Yes, sir.

Q. Can you nevertheless and regardless of your conscientious scruples against the infliction of the death penalty, follow the testimony and the evidence in this case and the instructions I will give you on the law, and return a verdict inflicting the death penalty, if you are convinced, you being the judge of the weight and worth of the evidence, and you find that the circumstances of the case warrants the infliction of the death penalty? Can you do that?

A. Not the death penalty. I can sentence him to life, but I don't believe in taking a life.

Q. All right. Now, because of your conscientious scruples against the infliction of the death penalty, would you automatically, because of having such scruples, vote against the infliction of the death penalty without regard to the evidence of the case?

A. Yes, sir, I probably would.

Q. Now, are you irrevocably committed against the infliction of the death penalty?

A. Yes, sir. I don't believe in it.

BY THE COURT: Mr. Turner, do you have any questions?

BY MR. TURNER: No, sir.

BY THE COURT: Mr. Donald, Mr. Brooks?

**EXAMINATION OF JUROR HAZEL HARVEY BY MR. BROOKS**:

Q. Mrs. Harvey, are you telling us that under no condition whatsoever, regardless of how heinous the crime may be, that you would inflict the death penalty?

A. No, sir.

Q. There is no crime that you can imagine that would deserve the death penalty in your opinion?

A. No, sir. According to law, we should be able to sentence them to prison for the rest of their life.

BY MR. BROOKS: Thank you, ma'am.

BY THE COURT: Mrs. Harvey, you are excused. You are free to go.

\* \* \*

**EXAMINATION OF JUROR HENRINE SMITH BY THE COURT:**

\* \* \*

[BY THE COURT:] Mrs. Smith, you indicated in the Courtroom that you have conscientious scruples against the infliction of the death penalty.

A. Yes, sir.

Q. But, can you nevertheless follow the testimony of the case and the law that I will give you, and return a verdict inflicting the death penalty, if you are convinced from the evidence, you being the judge of the evidence and the worth of it, and you find that the circumstances of the case warrants the infliction of the death penalty? Can you do that?

A. It would be against my faith, because of the Commandment saying about you shall not kill. You know, it would be against my faith and belief.

Q. All right. Because of your faith and belief and your scruples, would you automatically vote against the infliction of the death penalty, without regard to the evidence?

A. Yes. You know, even though I believe, you know, I just couldn't do it, you know, because of my faith in God, you know, and I just don't want to be a part of taking that part.

Q. Are you irrevocably committed against the infliction of the death penalty?

A. Yes. You know, I know a man should be punished, but, you know, the death sentence, you know, I wouldn't want to be a partaker in.

Q. Because of your conscientious scruples?

A. Yes.

BY THE COURT: Mr. Turner?

BY MR. TURNER: No questions.

BY THE COURT: Mr. Brooks?

## EXAMINATION OF JUROR HENRINE SMITH BY MR. BROOKS:

Q. Mrs. Smith, is there no crime in your imagination that you could come up with that would possibly justify the death penalty?

A. Well, I -- yes, I know, but I don't know how to explain it, but I just wouldn't want to be a part of it, you know. Even though it would seem deserving, you know, I just wouldn't want to be a part of causing this person to be put to death, even though I know it's still a deserving crime, because --

Q. Well, Mrs. Smith, if you were a part, and there wasn't anything you could do about being a part of a jury on a case, would there be some cases that would deserve the death penalty?

A. It would seem, yes, you know, but I just don't want to be a part of it.

Q. Let me ask you this: If you were on such a jury and it was a case in which the evidence indicated the Defendant deserved the death penalty, would you follow the instructions that the Court would give you as to how you weigh the evidence, and then if the evidence weighed out that you should return the death penalty, would you return the death penalty?

A. I would rather not.

## EXAMINATION OF JUROR HENRINE SMITH BY THE COURT:

Q. But, would you, or would you not?

A. I wouldn't, because, you know, God is the only one that has a right to do that.

BY MR. BROOKS: No further questions.

BY THE COURT: You are excused, Mrs. Smith. You are free to go.

* * *

## EXAMINATION OF JUROR AGER NELL BEAMON BY THE COURT:

* * *

[BY THE COURT:] Mrs. Beamon, you raised your hand in the Courtroom that you had conscientious scruples against the infliction of the death penalty, but would you nevertheless, regardless of your scruples, vote against the infliction of the death penalty, but would you follow the testimony of the case and the law that I will give you and return a verdict inflicting the death penalty, if you are convinced from the evidence, you being the judge of the weight and worth of the evidence, and you find that the circumstances of the case warrants the infliction of the death penalty? Can you do that?

A. I don't think I could.

Q. Because of your scruples against the infliction of the death penalty, would you automatically, because of such, vote against the infliction of the death penalty, without regard to the evidence of the case?

A. No.

Q. Are you irrevocably committed against the infliction of the death penalty?

A. Well, the Bible strictly speaks thou shall not kill, and I don't believe in the death penalty either, and I don't like to judge. I don't feel I have a right to judge anybody else.

BY THE COURT: Mr. Turner, any questions?

## EXAMINATION OF JUROR AGEL NELL BEAMON BY MR. TURNER:

Q. Mrs. Beamon, are you telling us if you were on this jury, and you were one of the twelve people that found the Defendant guilty, when we moved on to the second stage of the trial, would you automatically vote against the death penalty?

A. Probably would.

## EXAMINATION OF JUROR AGER NELL BEAMON BY THE COURT:

Q. Now, you said probably. Would you or would you not?

A. Yes, I would.

BY MR. TURNER: That's all.

## EXAMINATION OF JUROR AGER NELL BEAMON BY MR. BROOKS:

Q. Mrs. Beamon, can you think, and I don't need you to tell me what it is, but just in your imagination, can you think of any crime that would be so heinous that you might, if the evidence justified it, vote for the death penalty?

A. No.

## EXAMINATION OF JUROR AGER NELL BEAMON BY THE COURT:

Q. Why would you not vote for the death penalty?

A. I don't believe in it. I mean I just don't believe in the death penalty, because I can't. Our Bible says don't kill, do not kill, but I know peoples does do that, but it's not right.

BY THE COURT: Any more questions?

BY MR. BROOKS: No, sir.

BY THE COURT: Mrs. Beamon, you are excused. You are free to go.

¶10. We find that each of the three jurors was properly excused. After expressing conscientious scruples against the death penalty, each juror was subjected to sequestered voir dire, during which they each expressed a firm opposition to the death penalty which would have prevented or substantially impaired the performance of her duty as a juror in accordance with her instructions and oath. This assignment of error is therefore without merit.

## II. WHETHER THE TRIAL COURT ERRED IN OVERRULING WELLS' OBJECTIONS TO MISCONDUCT ON THE PART OF COUNSEL FOR THE PROSECUTION.

¶11. Under this assignment of error, Wells alleges several instances of prosecutorial misconduct during various stages of the trial.

### A. Improper Voir Dire

¶12. During voir dire of prospective jurors, the district attorney questioned the veniremen whether, with regard to the guilt phase of the trial, "what you will be solely concerned with is the guilt or innocence of Mack Wells?" Defense counsel objected to the phrasing of this question, which objection the trial judge overruled. Wells argues that this question had the effect of instructing the jury that Wells had to prove himself innocent in order to be found not guilty, thereby violating the principle stated in *McVeay v. State*, 355 So. 2d 1389, 1391 (Miss. 1978) that "[t]he burden of proof never shifts from the State in a criminal case."

¶13. The State points out that several times prior to the posing of this question by the district attorney, the trial judge used the phrase "innocence or guilt," with no objections by Wells, in explaining to prospective jurors what they would be charged with determining in the guilt phase. We recognize, as Wells points out, that it may sometimes be difficult to object to a statement by the trial judge during voir dire by the court. However, after the instant objection was made and when questioning jurors regarding the presumption of innocence, defense counsel himself referred to the jury's determination as one of "whether he is guilty or innocent." It is hard to give credence to Wells' claim that using the phrase "guilt or innocence" improperly shifts the burden of proof to the defendant when counsel for Wells himself saw fit to use the same phrase when explaining to prospective jurors the very principle of the presumption of innocence. In fact, Jury Instruction D-3, which charged the jury with determining the "guilt or innocence" of Wells, was submitted to the trial court by defense counsel.

¶14. The guilt phase of capital murder trials is routinely referred to by attorneys and courts alike, including this Court, as the "guilt or innocence" phase. In the case *sub judice*, the trial judge thoroughly explained to prospective jurors that Wells was presumed to be innocent and that the State

at all times would bear the burden of proving his guilt beyond a reasonable doubt. The trial court again instructed the jury on these principles in its jury instructions. We find that the jury was adequately and fairly informed of Wells' presumption of innocence and the proper burden of proof. Accordingly, this argument is without merit.

## B. Interview With the Television News Media

¶15. Before adjourning on the first day of trial, the trial judge instructed the jurors not to watch any television newscast concerning the case. After the court adjourned, the district attorney allowed himself to be interviewed by the local television news media, during which interview he stated that when police officers showed Wells the knives they found in the house where the body was found, Wells picked out the knife with which he committed the crime. This interview was televised during the ten o'clock news that night and again the next morning. When the court reconvened the next day, Wells immediately moved for a mistrial.

¶16. After hearing arguments from counsel, the trial judge declined to conduct individual voir dire of each juror regarding this matter as requested by defense counsel, but instead conducted the following jury poll:

> [BY THE COURT:] I instructed you not to discuss this case among yourselves, not to watch newscasts concerning this matter, and I asked you if there was a newscast on television regarding this matter, that you would turn it off instantly and not view it.
>
> Now, to all thirteen of you, I will ask you whether or not you followed my instructions.
>
> Did any of you at 10:00 o'clock last night watch a newscast regarding this case? All thirteen of you?
>
> Ma'am? Did you? Did you, ma'am, as the alternate juror? On the back row, did you? Mrs. Wilcher, did you? Did you? Did you? Did you? Did you? Did you? Did you? Did you? Did you?
>
> I had reference to any newscast that might have been at 10:00 o'clock last night.
>
> How about this morning? Did you watch the news at 6:00 o'clock this morning? You on the first row? Again, sir? Back row? All of you?
>
> Then all thirteen of you are telling me then that at no time last night or this morning, have you watched a newscast regarding this case; is that true? All thirteen of you? Once again, show me whether you did or did not.
>
> Then I want this record to show that upon being questioned by the Court, that all thirteen jurors have indicated by sign and by sound that they have not at any time viewed any newscast regarding this case.

After the jury retired to the jury room, the judge overruled Wells' motion for a mistrial.

¶17. Wells correctly points out that the interview given by the prosecutor constituted a clear violation of Uniform Circuit and Chancery Court Rule 9.01, which prohibits any attorney, prior to the conclusion of a trial, from releasing information to the news media regarding the "existence or

contents of any confession, admission or statement given by the defendant." In ***Hannah v. State***, 336 So. 2d 1317, 1323 (Miss. 1976), *cert. denied,* 429 U.S. 1101 (1977), we stated that "such action by a state's attorney is the most logical and certain way to secure a reversal in a criminal case presently known to the bench and bar." However, since there was no evidence in that case that any juror had observed the district attorney's interview on television, we concluded that the defendant was not prejudiced by the interview. ***Hannah***, 336 So. 2d at 1323. Wells contends that the trial court erred in denying his motion for a mistrial without first questioning the jurors individually in chambers to determine whether any of them had seen the newscast.

¶18. During the sexual battery trial of ***Earley v. State***, 595 So. 2d 430, 431 (Miss. 1992), *The Clarion Ledger* published an article about the case containing information disclosed during proceedings held outside the jury's presence. The trial judge polled the jury as to whether any of them had seen or read the article, and then individually questioned only those jurors who responded affirmatively. ***Earley***, 595 So. 2d at 431. The judge dismissed the one juror who had read that part of the article containing prejudicial material and denied the defendant's motion for a mistrial, which denial this we affirmed pursuant to ***Hannah***. *Id.* at 431-32. Thus, we found it unnecessary for the trial judge to conduct individual voir dire of those jurors who, in response to the jury poll, answered in the negative.

¶19. It is true that "whenever there is a question of outside influencing of a jury, the trial judge himself ought to examine the jury carefully to ensure that the jury's deliberations are based on the evidence produced at trial and not extraneous matters." ***Williamson v. State***, 512 So. 2d 868, 882 (Miss. 1987). We find that in this instance, individual polling of the jurors was sufficient for these purposes. We must assume that jurors answer truthfully when polled, else the entire polling procedure is rendered pointless. Had any of the jurors answered in the affirmative, i.e., that they had seen the newscast, then it certainly would have been appropriate to conduct individual voir dire in chambers to determine any prejudice to the defendant. When polled, however, each juror responded in the negative, and was reminded of his/her instructions not to watch any newscast regarding the case. Although the district attorney's television interview was inappropriate, the trial judge took adequate measures to ensure that such conduct did not prejudice the defendant. The trial judge did not err in denying Wells' motion for a mistrial.

### C. Improper Guilt Phase Closing Argument

¶20. Wells alleges two instances of prosecutorial misconduct during the guilt phase closing argument.

### 1) Statement of Fact Outside the Evidence

¶21. During the State's closing argument, the district attorney commented, "While Gary Wells lay on the floor bleeding to death for twenty to thirty minutes trying to talk to the Defendant, according to his statement, I imagine pleading for his life and to give him some help." Defense counsel immediately objected to this statement as being outside the evidence and an attempt to prejudice the jury. The trial judge sustained the objection and instructed the jury to disregard the statement. Defense counsel then moved for a mistrial, which motion the judge overruled. The district attorney then proceeded, "Maybe they were talking about the weather. I don't know, but the statement says they were talking about something, and rather than getting him help, he left him on the floor for twenty or thirty minutes to die, bleed to death." Wells argues the trial court erred in denying his motion for a mistrial.

¶22. Wells correctly points out that counsel may not, under the guise of argument, state facts that have not been proved by the evidence. *Pierce v. State*, 289 So. 2d 901, 903 (Miss. 1974). The State argues that the comment was not improper because it was a reasonably drawn inference from the evidence. Even if the comment was improper, the State contends, any error was corrected by the trial judge in sustaining the objection and instructing the jury to disregard the statement. We agree with the State.

¶23. Counsel is allowed considerable latitude in the argument of cases, and is limited not only to the facts presented in evidence, but also to deductions and conclusions he may reasonably draw therefrom, and the application of the law to the facts. *Ivy v. State*, 589 So. 2d 1263, 1266 (Miss. 1991); *Davis v. State*, 530 So. 2d 694, 701-02 (Miss. 1988). "He may draw whatever deductions seem to him proper from these facts, so long as he does not use violent and abusive language, and even in many cases invectives may be justified and even called for . . . ." *Shell v. State*, 554 So. 2d 887, 900 (Miss. 1989) (quoting *Nelms & Blum Co. v. Fink*, 159 Miss. 372, 131 So. 817 (1930)), *rev'd on other grounds*, 498 U.S. 1 (1990).

¶24. In his statement, which was introduced into evidence, Wells told police it took Gary twenty or thirty minutes to die, and that during this time Gary was talking, saying "Don't do this," and "You know you're wrong." If these facts themselves do not indicate that Gary was pleading for his life before he died, then certainly a reasonable inference can be drawn that he was doing such.

¶25. The recent capital murder case of *Davis v. State*, 684 So. 2d 643 (Miss. 1996), *cert. denied,* 117 S.Ct. 1437 (1997), involved almost exactly the same issue. During his closing argument at the sentencing phase, the prosecutor wondered aloud what the victim was thinking before she died, and whether she begged the defendant for mercy. *Davis*, 684 So. 2d at 655-56. We concluded that these statements were properly drawn inferences from the evidence of how and when the victim was shot and stabbed. *Id.* at 656.

¶26. Because the prosecutor's statement was not improper in this case, we do not reach the issue of whether the trial judge corrected any error by sustaining the objection and instructing the jury to disregard the statement. This argument is without merit.

### 2) "Golden Rule" Violation

¶27. Another portion of the district attorney's closing argument went as follows:

[BY MR. TURNER:] You know, this case hits kind of close to home to me. I've got a thirteen year old. Got another one that's not much older than that.

BY MR. DONALD: I am going to object to that form of argument.

BY THE COURT: Overruled.

BY MR. DONALD: It is certainly improper.

BY THE COURT: Objection overruled.

BY MR. TURNER: I can't imagine a set of circumstances when somebody could come into my

house while my child is sitting on the couch watching television or asleep, stab them seventeen times --

BY MR. DONALD: Your Honor, could I have a continuing objection to that line of argument?

BY THE COURT: Yes, you have an objection, which is overruled.

BY MR. TURNER: Leave him on the floor to bleed to death, and then throw him in a shallow grave, and call that self-defense. I couldn't call that anything but capital murder, and I would venture to say that if it was your child, you couldn't call it anything else either.

BY MR. DONALD: Your Honor, that is obviously improper, prejudicial. The District Attorney well knows it. We object to it.

BY THE COURT: Overruled.

BY MR. TURNER: If you and I --

BY MR. BROOKS: Your Honor, we would like to move for a mistrial, also, based on that.

BY THE COURT: Motion is overruled.

BY MR. TURNER: If you and I expect the law to protect our children or anybody else's children, then it has got to stand up for Gary Wells, too. . . .

Wells argues the district attorney's comments contained impermissible personal references and clearly violated the "golden rule," and thus the trial judge erred in overruling Wells' objections and motion for a mistrial.

¶28. In *Chisolm v. State*, 529 So. 2d 635, 639-40 (Miss. 1988), we stated:

It has long been the law in this state that "golden rule" arguments, i.e., asking the jurors to put themselves in the place of one of the parties, will not be permitted in civil cases. . . . There is no reason on principle why this prohibition on "golden rule" arguments should not extend as well to criminal cases.

(citations omitted). In that case, however, we found that "the argument was sufficiently insignificant in the overall context of the case before us that we find the error harmless." *Chisolm*, 529 So. 2d at 640. We hold that the same is true in the case *sub judice*.

¶29. Where a prosecutor has made an improper argument, the question on appeal is "whether the natural and probable effect of the improper argument of the prosecuting attorney is to create an unjust prejudice against the accused as to result in a decision influenced by the prejudice so created." *Davis v. State*, 530 So. 2d 694, 701 (Miss. 1988). In light of the overwhelming evidence against Wells, the jury's verdict likely was not influenced by any prejudice that might have resulted from the district attorney's isolated "golden rule" argument. Wells concedes that "[p]ossibly these improper comments alone may not be reversible error," but argues that when considered together with the other instances of prosecutorial misconduct, the error requires a new trial. As this opinion has discussed, however, the "golden rule" violation is Wells' only allegation of uncured prosecutorial

misconduct which has merit. We find that standing alone, this error was harmless.

### III. WHETHER THE TRIAL COURT ERRED IN OVERRULING WELLS' MOTION FOR MISTRIAL FOLLOWING THE ADMISSION INTO EVIDENCE OF THE KNIFE AS STATE'S EXHIBIT NO. 9 AND WELLS' STATEMENT CONCERNING SAME.

¶30. Prior to trial, Wells filed a Motion to Suppress Confessions. When the trial court took up the motion on the first day of trial, the judge stated that a suppression hearing would be conducted outside the presence of the jury during the trial. During the prosecution's direct examination of Officer Jimmie Nichols, Nichols was asked whether he had questioned Mack Wells about the death of Gary Wells. Defense counsel moved for a suppression hearing, which the trial judge then conducted outside the presence of the jury.

¶31. During the hearing, several witnesses testified regarding the written statement in which Wells confessed to killing Gary. After hearing the testimony, the judge overruled any objections to the admission of the written statement. No testimony was elicited during this hearing regarding Wells' oral identification of the knife, and the judge made no ruling as to the admissibility of the knife or Wells' identification of it.

¶32. After the jury returned to the courtroom, the prosecution continued its examination of Officer Nichols, during which Wells' written statement was introduced into evidence. Officer Nichols further testified that when Wells was shown a group of knives collected from the house where Gary's body was buried, Wells picked out the knife he used to kill Gary. Overruling Wells' objection and motion for a mistrial, the trial judge admitted the knife into evidence as State's Exhibit No. 9.

¶33. At the close of Officer Nichols' testimony and outside the presence of the jury, Wells again moved for a mistrial, contending that Wells' oral identification of the knife was made at a different time than the written confession and was not voluntary. Wells argued that the trial court erroneously admitted into evidence the knife and Wells' statement concerning same without first having addressed their admissibility during a suppression hearing. The State then moved to reopen the suppression hearing, which motion the court granted. After hearing testimony from the officers present during Wells' identification of the knife, the judge ruled as follows:

> Your motion for mistrial is overruled. The motion was made at the time -- at the conclusion of the testimony of Officer Nichols, who testified regarding a knife and that the knife was recovered by an officer and brought to the Defendant while he was in the cell.
>
> He testified that it was moments later, or the same day.
>
> The motion for mistrial was made. The State moved to be permitted to reopen the case, so as to call and receive the testimony of the other officers of the law who were present, and all three have now testified that the interview occurred within the Courtroom area of the Police Station, and upon completion of the taking of the statement, Officer Joe Lee left the Courtroom, went to the evidence vault, retrieved the knives, and at the time that he returned, one officer said it was only a matter of seconds, another officer said it was possibly one minute to two minutes, that Joe Lee appeared, and the Defendant was within the cell.

There is some confusion of whether or not the door was locked or not, but that is not really important, I don't think. He asked him which knife it was, and the Defendant identified the knife that has been introduced into evidence.

When you refer to the statement that was taken from the Defendant, the Defendant having given his confession, and it having been reduced to writing, the confession itself says it was a long, big, blue chicken knife, and then at the last four lines of the statement, he says, "I took the knife and cleaned it off, and put it on the rack."

The officers have testified that they retrieved these knives. They were placed in the evidence room. There was a continuous, unbroken, event shortly after the giving of the Miranda and the taking of the statement.

So, your motion for mistrial is overruled.

The judge further ruled that since Wells was properly *Mirandized* prior to his written statement, "it also follows that there being no broken events between that time and the time of the identity of the knife, the waiver of his rights was still in effect, and he knowingly and intelligently waived them and identified the knife."

¶34. In this appeal, Wells does not challenge the admissibility of the knife and Wells' identification of it, but rather he argues the trial court erred in admitting the evidence prior to ruling on its admissibility in a suppression hearing. Wells cites the rule set forth by this Court in *Agee v. State*, 185 So. 2d 671, 673 (Miss. 1966) that "[w]hen objection is made to the introduction of the confession, the accused is entitled to a *preliminary* hearing on the question of the admissibility of the confession." (emphasis added). The State argues that although a mistrial would have been appropriate had the trial court in the subsequent suppression hearing found Wells' identification of the knife to be inadmissible, Wells in fact suffered no prejudice since the evidence was found to be admissible. We agree with the State.

¶35. The purpose of the *Agee* rule is to protect defendants from the admission into evidence of confessions which were not voluntary. *See Agee*, 185 So. 2d at 673. Naturally, in order to avoid the needless expense and delay of mistrials where confessions are admitted only later to be found involuntary, the suppression hearing should be conducted prior to the admission of the confession into evidence. However, where the trial court admits a confession without a suppression hearing, but nonetheless finds the confession to be voluntary and admissible in a subsequent hearing, the mere fact that the admissibility of the confession was not addressed prior to its introduction into evidence cannot be said to have prejudiced the defendant.

¶36. During the subsequent suppression hearing in the case *sub judice*, the State offered the testimony of all the officers who were present when Wells identified the knife. Their uncontradicted testimony was to the effect that the identification occurred immediately following Wells' written confession for which he knowingly and intelligently waived his *Miranda* rights, and that the identification was voluntarily made. In fact, Wells does not challenge the trial judge's finding as to the voluntariness and admissibility of the oral identification. We hold that the trial court's technical deviation from the *Agee* rule's preliminary hearing requirement did not unfairly prejudice Wells' defense, and thus the error was harmless.

**IV. WHETHER THE TRIAL COURT ERRED IN OVERRULING WELLS' MOTION FOR MISTRIAL FOLLOWING IMPROPER COMMENT ON THE EVIDENCE BY THE TRIAL JUDGE.**

¶37. During its examination of Officer Joe Lee, the prosecution sought to introduce into evidence a photograph of Gary Wells. Wells objected to the admission of the photograph, arguing it had no probative value and contained other persons besides Gary Wells. In overruling Wells' objection, the trial judge stated:

> I think it would be helpful to the jury in having a photograph of the deceased, especially in light of the statements set forth in the statement that has already been admitted into evidence regarding any difficulty that occurred between the deceased and the Defendant.

¶38. After the photograph was admitted and out of the hearing of the jury, Wells moved for a mistrial based on impermissible comment on the evidence by the trial judge. After hearing argument from defense counsel, the judge stated:

> In the case of **Hannah v. State**, 336 So. 2d 1317, the Trial Judge made a comment upon the evidence, over the objection of the Defendant. The Supreme Court ruled that they thought the statement of the Judge was an explanation of the Court's ruling, and went further and cited another case, holding, "That an over-speaking Judge is no well-tuned symbol [sic], and we think that there was no prejudice resulting from the Judge's remarks, and observe there is no way a Judge can conduct a trial in silence, nor do we think it can be logically argued his every word is a comment upon the evidence"

> Now, in this case, there was an objection to the photograph. The statement has been admitted. That is, the confession of the Defendant has been admitted and has been read to the jury. That statement contains evidence of the Defendant and the deceased getting into some physical difficulty.

> So, in ruling upon the admissibility of the photograph, it was necessary for me to make some comment regarding the admissibility. I cannot retire the jury, and particularly in this Courthouse, where the jury is required to walk outside the Courtroom, down a hallway, for some thirty feet to get to the entrance of the Jury Room on every objection and every ruling of the Court.

> I feel it is helpful to the Supreme Court to understand the Court's reasoning in making rulings, and, therefore, I made a comment. I fail to see where it is prejudicial, because it was only regarding matters that have already been introduced into evidence.

> Your objection is overruled.

Wells argues that the trial judge's comment regarding the admissibility of the photograph constituted improper comment on the evidence, and thus the trial court erred in overruling Wells' motion for a mistrial.

¶39. Trial judges may explain their rulings on evidentiary objections so long as they do not comment

upon the evidence in a prejudicial manner. *Johnson v. State*, 475 So. 2d 1136, 1141 (Miss. 1985); *Haralson v. State*, 314 So. 2d 722, 724 (Miss. 1975). In the capital murder case of *Stokes v. State*, 548 So. 2d 118, 120, 124 (Miss. 1989), *cert. denied,* 493 U.S. 1029 (1990), the defendant had claimed in his statement that he shot the victim in self-defense, whereas the autopsy and photographs indicated that the victim was strangled to death. The trial judge stated that he would admit photographs of the victim's corpse "in light of the statement that was admitted into evidence" and "for the purpose of sustaining the State's position as to the cause of the injury or death." *Stokes*, 548 So. 2d at 125. On appeal, we affirmed, stating:

> The law "does not place the judge in a straightjacket nor prevent him from having anything to say during the course of a trial. Of course, he should keep off of the province of the jury, and not try to influence their verdict; and while it might be safer for him to rule without giving his reasons therefore, he has the right to give such reasons if he so desires, and to show why, in his opinion, the reasons advanced for a contrary ruling are unsound. In so doing, he may go too far and transgress the proprieties; but such is not the case here . . . . It is true that an overspeaking judge is no well-tuned cymbal, but . . . neither is an aphonic dummy a becoming receptacle for judicial power."

*Stokes*, 548 So. 2d at 125 (quoting *Bumpus v. State*, 166 Miss. 276, 281-82, 144 So. 897, 898-99 (1932)).

¶40. In the case *sub judice*, immediately prior to introducing the photograph of Gary Wells, the prosecutor established from the testimony that Gary was about five feet three inches tall and weighed from 100 to 105 pounds. The photograph evidently was introduced for the purpose of displaying these physical characteristics to the jury so as to refute any contention by the defense that Gary was killed in self-defense, as was apparently claimed by Wells in his written statement. The trial judge recognized the probative value of the photograph on this point, and his comment was nothing more than an explanation of that relevance. We find that the judge's statement was not an improper comment on the weight of the evidence nor an attempt to influence the jury's verdict, and thus he did not err in overruling Wells' motion for a mistrial.

¶41. Finding that no reversible error occurred during the guilt phase of the trial, we affirm the jury verdict and judgment of conviction.

### V. WHETHER THE TRIAL COURT ERRED IN OVERRULING WELLS' OBJECTION TO THE ADMISSION INTO EVIDENCE OF STATE'S EXHIBIT NO. 17 DURING THE SENTENCING PHASE OF THE TRIAL.

¶42. During the sentencing phase of trial, the State introduced a certified copy of the judgment and commitment order in the Circuit Court of Scott County wherein Mack Wells was convicted of the crime of aggravated assault and sentenced as an habitual offender to serve a term of life imprisonment without parole. This conviction and sentence occurred after the murder of Gary Wells, and was admitted over Wells' objection as State's Exhibit No. 17. Wells argues that in showing aggravating circumstances, the State is limited to evidence of those convictions and sentences which occurred before the crime for which the defendant is being tried, and thus the trial court erred in overruling his objection to the admission of this evidence.

¶43. Miss. Code Ann. § 99-19-101(5)(b) (1972) provides that aggravating circumstances shall be limited to, among other things, evidence that "[t]he defendant was previously convicted of another capital offense or of a felony involving the use or threat of violence to the person." We have repeatedly held that convictions subsequent to the crime for which a person is being sentenced may be used as proof of aggravating circumstances. *Taylor v. State*, 672 So. 2d 1246, 1275 (Miss.), *cert. denied,* 65 USLW 3369 (1996); *Turner v. State*, 573 So. 2d 657, 670 (Miss. 1990), *cert. denied*, 500 U.S. 910 (1991); *Leatherwood v. State*, 435 So. 2d 645, 651-52 (Miss. 1983), *cert. denied*, 465 U.S. 1084 (1984); *Jones v. State*, 381 So. 2d 983, 994 (Miss.), *cert. denied*, 449 U.S. 1003 (1980); *Reddix v. State*, 381 So. 2d 999, 1009-10 (Miss.), *cert. denied*, 449 U.S. 986 (1980). Accordingly, this assignment of error is without merit.

### VI. WHETHER THE STATE'S CLOSING ARGUMENT DURING THE SENTENCING PHASE WAS IMPROPER AND WARRANTS A REVERSAL OF THE SENTENCE.

¶44. Wells alleges several instances of misconduct during the State's sentencing phase closing argument.

### A. Comment on Wells' Exercise of Specific Constitutional Rights

¶45. During closing argument, the prosecutor made the following comments:

[BY MR. DUNCAN:] Last year, for whatever reason, this Defendant decided that Gary Wells needed to die. He carried it out. He did it brutally, and then buried him in the backyard. For whatever reason, he justified it.

And, he didn't come and ask twelve people like yourselves if that was okay. He didn't have, Gary Wells didn't have two lawyers to plead his case. Gary Wells didn't have the opportunity to have his family come and plead his case to the Defendant. Gary Wells didn't have the protection of the law.

The trial court overruled Wells' objection and motion for a mistrial.

¶46. We have in previous cases discussed the propriety of prosecutorial comments virtually identical to those above. In *Davis v. State*, 684 So. 2d 643, (Miss. 1996), *cert. denied*, 117 S.Ct. 1437 (1997), during sentencing phase closing arguments, the prosecutor stated that Davis "was the judge and the defense lawyer . . . . He was the jury. And he decided in his own mind to kill and murder . . . . Mr. Davis had due process." Davis claimed that the statements constituted an improper comment on his exercise of specific constitutional rights. *Davis*, 684 So. 2d at 654. In *Shell v. State*, 554 So. 2d 887, 900 (Miss. 1989), *rev'd on other grounds*, 498 U.S. 1 (1990), Shell made the same contention regarding the prosecutor's comment that Shell "was clothed in the full protection of the Constitution of the United States and he got what [the victim] never got. And that is a jury of twelve good people to decide his fate."

¶47. In each case, we held that since there was no other portion of the closing argument to the same effect, the comments by the State were isolated and did not warrant a reversal. *Davis*, 684 So. 2d at 655; *Shell*, 554 So. 2d at 900. Likewise, there having been no other statements to the same effect

during closing arguments in the case *sub judice*, we find that the comments were isolated and do not warrant a reversal.

### B. "Danger to Others in Prison" Argument

¶48. Referring to the jury's option of sentencing Wells to life in prison without possibility of parole, the prosecutor stated, "Well, you know, ladies and gentlemen, there are other people in prison, too. You have got prison guards and secretaries and bookkeepers and even other prisoners themselves." After the trial court overruled Wells' objection, the prosecutor continued, "You know, they deserve some protection from somebody like this. Life in prison without parole is not going to protect them one iota." Wells then moved for a mistrial, which motion the trial court overruled.

¶49. In the case of *Woodward v. State*, 533 So. 2d 418, 433 (Miss. 1988), *cert. denied,* 490 U.S. 1028 (1989), the prosecutor stated in closing arguments, "You know, as bad as I hate to say it, what about prisoner's rights? What about those people in Parchman who are in there for drugs?" In our opinion, we engaged in a discussion of recent federal cases that dealt with this type of argument. In *Brooks v. Kemp*, 762 F.2d 1383, 1411 (11th Cir. 1985), *vacated on other grounds*, 478 U.S. 1016 (1986), where the prosecutor suggested that the defendant might kill a guard or fellow prisoner, the Eleventh Circuit held that the prosecutor's comments were "directly relevant to the consideration of whether [the defendant] would remain a threat to society." In another case, the Eleventh Circuit held that an argument about the safety of prisoners and guards should the defendant be sentenced to life in prison did not call for a speculative inquiry into prison conditions and was an appropriate means of pointing out the possibility of the defendant's future dangerousness. *Tucker v. Kemp*, 762 F.2d 1480, 1486 (11th Cir.), *vacated on other grounds*, 474 U.S. 1001 (1985). In light of these decisions, we found the assignment of error to be without merit. *Woodward*, 533 So. 2d at 434. Likewise, we hold that the prosecutor's comments in the case *sub judice* were not improper.

### C. Victim Impact Argument

¶50. In reference to Wells' contention during the sentencing phase that his mind "snapped" and he acted under extreme duress, the prosecutor made the following comments:

> [BY MR. TURNER:] Dr. Stanley and Dr. guild pointed out that in their observation of him, the history they took from him, the police reports they read, that wasn't the case. His mind didn't snap. He knew exactly what he did and he told them.

> He stabbed him several times. He left him on the floor to bleed to death for twenty or thirty minutes. We are talking about a thirteen year old child he left on the floor to bleed to death for twenty or thirty minutes.

> He drug him in the kitchen, and Gary was still talking to him. "You know you are doing wrong, " Gary said.

> BY MR. BROOKS: Your Honor, we are going to object. This is victim impact argument, improper in this phase.

> BY THE COURT: Objection overruled.

BY MR. TURNER: He cleaned the knife that he stuck in Gary Wells seventeen times while Gary Wells was lying there bleeding to death. He cleaned his own clothes.

BY MR. BROOKS: Your Honor, we would like to renew that objection and move for a mistrial.

BY THE COURT: Objection overruled. Motion overruled.

BY MR. TURNER: He cleaned up the murder scene. He wrapped the lifeless child in a shower curtain and buried him in a shallow grave in the backyard.

His mind didn't snap. He knew exactly what he did, and when he did it, according to Dr. Guild and Dr. Stanley.

Dr. Guild testified spending thirty minutes watching somebody die is certainly not acting under duress. Dr. Guild said he was as cool as a cucumber.

Wells argues that these statements by the prosecutor were improper. The State argues that these comments did not constitute victim impact argument and that, even if they did, such argument was not improper. We agree with the State.

¶51. Victim impact statements are those which describe the victim's personal characteristics, the emotional effect of the crimes on the victim's family, and the family's opinions of the crimes and the defendant. *See* ***Booth v. Maryland***, 482 U.S. 496 (1987). The statements at issue in the case *sub judice* mentioned no characteristics of Gary Wells save his age, and made absolutely no mention either of the emotional impact of the crime on Gary's family or of his family's opinion of the crime or Wells. Rather, the statements contained merely the detailed circumstances of the offense, which information the Supreme Court has held is a constitutionally indispensable part of the process of inflicting the death penalty. ***Woodson v. North Carolina***, 428 U.S. 280, 304 (1976).

¶52. Even if the comments could be construed as victim impact statements, we have adopted the opinion of the Supreme Court in ***Payne v. Tennessee***, 501 U.S. 808 (1991) that the Eighth Amendment does not bar victim impact evidence and prosecutorial argument during the penalty phase of a capital trial. ***Conner v. State***, 632 So. 2d 1239, 1276-77 (Miss. 1993), *cert. denied,* 513 U.S. 927 (1994); ***Jenkins v. State***, 607 So. 2d 1171, 1183 (Miss. 1992); ***Hansen v. State***, 592 So. 2d 114, 146-47 (Miss. 1991), *cert. denied*, 504 U.S. 1231 (1992). "A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." ***Jenkins***, 607 So. 2d at 1183 (quoting ***Payne***, 501 U.S. at 827). This argument is without merit.

### D. "Send a Message" Argument

¶53. The prosecutor also made the following statements during closing arguments:

[BY MR. TURNER:] The third reason for a sentence is deterrence. Now, the death penalty in this case will certainly deter the Defendant from killing anybody else, but it will also do more than that. A death penalty sentence in this case will send a strong and clear message to other child abusers in this county and in this state that we protect our children, and we are not going

to stand for one instant --

BY MR. BROOKS: Your Honor, I am going to object to this law and order argument.

BY THE COURT: Overruled.

BY MR. TURNER: For somebody to take a chicken knife and stab a thirteen year old boy over and over and over again and not get the death penalty.

¶54. We have cautioned prosecutors to refrain from using this type of argument. *Hunter v. State*, 684 So. 2d 625, 637 (Miss. 1996); *Williams v. State*, 522 So. 2d 201, 209 (Miss. 1988). In *Williams*, we explained as follows:

> The jurors are representatives of the community in one sense, but they are not *to vote in a representative capacity*. Each juror is to apply the law to the evidence and vote accordingly. The issue which each juror must resolve is not whether or not he or she wishes to "send a message" but whether or not she believes that the evidence showed the defendant to be guilty of the crime charged. The jury is an arm of the State but it is not an arm of the prosecution. The State includes both the prosecution and the accused. The function of the jury is to weigh the evidence and determine the facts. When the prosecution wishes to send a message they should employ Western Union. Mississippi jurors are not messenger boys.

522 So. 2d at 209. Although we declined in *Williams* to reverse on this assignment due to insufficient preservation of the record, we quoted a similar case in stating, "We do not think that this assignment of error alone would require reversal." *Id.* (quoting *Fulgham v. State*, 386 So. 2d 1099, 1101 (Miss. 1980)). In any event, an analysis of this assignment of error requires an examination of the context in which it arose. *Williams*, 522 So. 2d at 209. "In order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remark, but must also take into account defense counsel's opening salvo." *Id.* (quoting *Booker v. State*, 511 So. 2d 1329, 1331 (Miss. 1987), *cert. denied,* 485 U.S. 982 (1988)).

¶55. In his sentencing phase closing argument, defense counsel asked the jury to consider "[w]hether people can say that in Leake County, Mississippi, they give the death penalty to mentally retarded people." In effect, defense counsel was the first to tell jurors that their sentencing verdict would "send a message." This is precisely the type of argument of which Wells now complains. Furthermore, as we explained in *Williams*, *supra*, the danger inherent in the "send a message" argument is that jurors will neglect their duty to determine whether "the evidence showed the defendant to be guilty of the crime charged." 522 So. 2d at 209. This danger does not exist at the sentencing phase, where the defendant has already been found guilty of capital murder. The sole determination to be made at this point is whether the death penalty should be imposed. We choose not to fault the prosecution for arguing that the "message" conveyed by a death penalty verdict would be different than that urged by the defense. To do so would be disingenuous given the inescapable reality that deterrence is, in fact, an established goal of imposing the death penalty, which goal necessarily entails, to some extent, sending a message. The trial court did not err in permitting this argument by the prosecution.

### E. "Anything Less than the Death Penalty Would Be Like No Punishment at All"

¶56. The final instance of sentencing phase misconduct of which Wells complains consists of the following statements by the prosecutor:

> [BY MR. TURNER:] The Defendant is already serving life without parole for his aggravated assault. You know, to give him anything less than the death penalty would be like not giving him any punishment at all. He has already got what the defense is asking you to give him, no punishment at all for the brutal murder of Gary Wells.

Wells contends that this argument was improper and constitutes reversible error under *Hartfield v. State*, 186 Miss. 75, 89-91, 189 So. 530, 532-34 (1939).

¶57. A review of the record reveals that no objection was raised to these comments at trial and it is raised for the first time on this appeal. Any claim is waived for failure to raise a contemporaneous objection. *Ballenger v. State*, 667 So. 2d 1242, 1272 (Miss. 1995), *cert. denied,* 116 S.Ct. 2565 (1996); *Davis v. State*, 660 So. 2d 1228, 1245 (Miss. 1995), *cert. denied,* 116 S.Ct. 1684 (1996); *Chase v. State*, 645 So. 2d 829, 854 (Miss. 1994), *cert. denied,* 115 S.Ct. 2279 (1995); *Hansen v. State*, 592 So. 2d 114, 139-40 (Miss. 1991), *cert. denied,* 504 U.S. 921 (1992). Accordingly, Wells is procedurally barred from raising this issue for the first time on appeal.

¶58. Finding no reversible error among Wells' allegations of improper closing arguments by the prosecution, we find that this assignment of error must fail.

### VII. WHETHER, AT THE TIME OF THE CRIME, WELLS WAS UNDER EXTREME MENTAL OR EMOTIONAL DISTURBANCE AND HIS CAPACITY TO CONFORM HIS CONDUCT TO THE REQUIREMENTS OF THE LAW WAS SUBSTANTIALLY IMPAIRED.

¶59. Wells argues finally that a sentence of death was improper since Dr. Mark Webb, a psychiatrist called by the defense, testified that at the time of the crime Wells was under extreme mental or emotional disturbance, and his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. Dr. Webb testified that Wells' intelligence quotient (IQ) was around 62, falling within the mild retardation range. Wells points out that two of the State's experts, Dr. Donald Guild and Dr. Charlton Stanley, agreed that Wells was mentally retarded. Wells urges us to follow the case of *Edwards v. State*, 441 So. 2d 84 (Miss. 1983), wherein we vacated a death sentence and remanded for imposition of a life sentence, two justices being of the opinion that "there was no credible evidence in the record which would support any view other than that the defendant . . . was seriously mentally disturbed at the time of the crime." 441 So. 2d at 97 (Robertson, J., joined by Prather, J., on sentence phase).

¶60. The Eighth Amendment does not categorically prohibit the execution of mentally retarded persons. *Jones v. State*, 602 So. 2d 1170, 1175 (Miss. 1992) (citing *Penry v. Lynaugh*, 492 U.S. 302, 340 (1989)). We have determined that mentally retarded persons may be subject to the death penalty under Mississippi law as well. *Jones*, 602 So. 2d at 1175; *Neal v. State*, 451 So. 2d 743, 762 (Miss.), *cert. denied,* 469 U.S. 1098 (1984). In order to uphold a mentally retarded defendant's Eighth Amendment protection against cruel and unusual punishment, the jury must be provided a vehicle with which to consider and give effect to the mitigating evidence of his mental retardation in rendering its sentence. *Jones*, 602 So. 2d at 1174 (citing *Penry*, 492 U.S. at 328).

¶61. Miss. Code Ann. § 99-19-101(6) (1972) sets forth the mitigating circumstances which the sentencing jury in death penalty cases must consider. Included are § 99-19-101(6)(b), "[t]he offense was committed while the defendant was under the influence of extreme mental or emotional disturbance," and § 99-19-101(6)(f), "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired." Pursuant to this statute, the jury in the case *sub judice* was instructed to consider these mitigating circumstances. The jury also heard extensive argument from defense counsel regarding Wells' mental retardation and its impact on these mitigating factors. We have determined that Mississippi's sentencing scheme in death penalty cases, together with appropriate jury instructions and appropriate argument, satisfies the constitutional concern expressed above regarding mentally retarded defendants. *Jones*, 602 So. 2d at 1174. This concern therefore has been met in the instant case.

¶62. As to the case cited by Wells, we have held that *Edwards* is of no precedential value since it represents only a plurality vote. *Conner v. State*, 632 So. 2d 1239, 1265 (Miss. 1993), *cert. denied,* 115 S.Ct. 314 (1994). In any event, *Edwards* is distinguishable from the instant case. In *Edwards*, the defendant was committed to the Mississippi State Hospital at Whitfield under a court adjudication and order that he was insane. 441 So. 2d at 87. He left the institution without permission, and while out he committed the homicide of a policeman. We commuted his death sentence to a life sentence because "[t]he evidence in this case is overwhelming, if indeed not without contradiction, that Edwards has a long history of suffering from the mental disease schizophrenia of a paranoid type." *Id.* at 93 (Hawkins, J., joined by Patterson, C.J. and Roy Noble Lee, J., on sentence review). We have previously distinguished *Edwards* from situations where the defendant was only mildly retarded. *Jones v. State*, 517 So. 2d 1295, 1303 (Miss. 1987) (defendant having IQ of 61), *vacated on other grounds*, 487 U.S. 1230 (1988); *Neal*, 451 So. 2d at 762 (defendant having IQ of 54).

¶63. In the case *sub judice*, the only point upon which State and defense experts agreed was that Wells was mildly mentally retarded. Defense expert Dr. Mark Webb testified that mental retardation alone would not cause extreme emotional disturbance. Although he testified that he believed Wells suffered from paranoid schizophrenia, there was no evidence in the record, aside from a history of criminal activity, which indicated a history of psychological problems.

¶64. State's expert Dr. Donald Guild, on the other hand, testified that Wells' "staying there for twenty to thirty minutes while the young man died, with a conversation going back and forth," and then "taking him out, burying him, and cleaning up," were not conistent with a mental snap or true mental illness. He did not believe Wells was under the influence of extreme mental or emotional disturbance, testifying instead that Wells was "cool as a cucumber." Dr. Guild testified that in his opinion, Wells' capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not substantially impaired. He also testified that he did not think Wells suffered from paranoid schizophrenia, but rather that Wells had an antisocial personality. State psychologist Dr. Charlton Stanley gave the same opinions in his testimony as well.

¶65. We find that there was sufficient evidence in the record to support the jury's finding in this case that the aggravating circumstances, i.e., Wells was previously convicted of another capital offense or of a felony involving the use or threat of violence to the person and the capital offense was committed while Wells was engaged in the criminal or felonious abuse and/or battery of a child, outweighed any mitigating circumstances pursuant to the requirements of Mississippi's statutory

death penalty scheme. Furthermore, we find both that the sentence of death was not imposed under the influence of passion, prejudice or any other arbitrary factor, and that the death sentence is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Accordingly, we affirm the jury verdict imposing the death sentence.

## CONCLUSION

¶66. We find no reversible error among Wells' assignments. Furthermore, the aggregate effect of various harmless errors did not create an atmosphere of bias, passion and prejudice such as to deny Wells a fundamentally fair trial, either at the guilt phase or at the sentencing phase. We therefore affirm Wells' conviction and death sentence.

¶67. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION AFFIRMED. EXECUTION DATE TO BE SET WITHIN SIXTY DAYS OF FINAL DISPOSITION OF THIS CASE PURSUANT TO MISS. CODE ANN. § 99-19-105(7) (1996) AND M.R.A.P. 41(a).**

**LEE, C.J., PRATHER, P.J., PITTMAN, ROBERTS AND SMITH, JJ., CONCUR. BANKS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY BANKS, J.**


### BANKS, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:


¶68. I am compelled to dissent from so much of today's judgment as affirms the sentence imposed in this case. In my view, the uncorrected "Golden Rule" argument given in the guilt phase together with the equally condemned "send a message" argument used in the sentencing phase irreparably taints the death sentence rendered here.

¶69. We have long condemned the use of the so-called "Golden Rule" argument in both civil and criminal cases. *Danner v. Mid-State Paving Co.*, 252 Miss. 776, 786, 173 So. 2d 608 (Miss. 1965); *Chisolm v. State*, 529 So. 2d 635, 640 (Miss. 1988). "[I]t is improper to permit an attorney to tell the jury, in effect, that the law authorizes it to depart from neutrality and to make its determination from the point of view of bias or personal interest." *Id.* Nevertheless, we have more often than not found reason to affirm, despite this acknowledged misconduct.

¶70. In *Alexander v. State*, 520 So. 2d 127, 130-131 (Miss. 1988) we observed the curative effect of the trial court having sustained an objection to the argument and admonished the jury to disregard it. *See also* *Holifield v. State*, 275 So. 2d 851, 856 (Miss. 1973). Later in *Ormond v. State*, 599 So. 2d 951, 961 (Miss. 1992) we stretched that doctrine to cover an occasion where the court overruled the objection but immediately instructed the jury that what counsel said was just argument not evidence. We noted the curative impact of a written jury instruction to the effect that an argument should be disregarded if it has no basis in the evidence and consequently we held that the improper argument

did not require reversal. *Id.* Finally, in **Chisolm v. State**, 529 So. 2d 635, 640 (Miss. 1988), where the objection to the argument was overruled and there was no indication of a special admonition, we found that "the argument was sufficiently insignificant in the overall context of the case" to be harmless.

¶71. This is a death case. While there is overwhelming evidence of guilt making the improper prosecution argument "sufficiently insignificant" on the question of guilt, the argument, made as it was to the death-deciding jury, must be considered as well for its potential effect on the punishment decision. *See* **Caldwell v. State**, 481 So. 2d 850, 852 (Miss. 1985) (noting that Court had reviewed argument in both guilt and sentencing phases for prejudice in sentencing); *see also* **Middleton v. Evatt**, 855 F. Supp. 837, 846 n. 8 (D.S.C. 1994), *aff'd.,* 77 F.3d 469 (4th Cir. 1996) (noting that the "prejudice" prong analysis under **Strickland v. Washington**, 466 U.S. 668 (1984), in capital trial must include consideration of the impact that deficiencies which occurred during guilt phase had on the eventual sentencing); **Mack v. State**, 650 So. 2d 1289, 1337 (Miss. 1994) (Banks, J., dissenting) (noting that evidentiary errors made in the guilt phase which might be deemed harmless on that issue may nevertheless take on added gravity in the sentencing phase).

¶72. As we consider that argument for its impact upon sentence, we must also bring to bear other transgressions in the closing argument during the sentencing phase. There, as the state concedes, the prosecutor employed the "send a message" argument that this Court has long condemned. **Hunter v. State**, 684 So. 2d 625 (Miss. 1996); **Williams v. State**, 522 So. 2d 201, 209 (Miss. 1988). While conceding our words on the topic, the state takes comfort in our actions, observing that we have never reversed a case based upon that admittedly improper argument. It notes that Wells was prosecuted by the same district attorney who made the argument in **Hunter**, which we declined to hold reversible. Perhaps it is merely coincidental that the same trial judge who overruled the objection to the "Golden Rule" argument in **Chisolm** presided at the instant trial.

¶73. In my view, the combination of these two previously condemned yet uncorrected arguments impermissibly taints the death decision such that it should be set aside and this case remanded for a new and fair sentencing hearing. I cannot find the error here to be harmless. Nor can I support the majority's analysis that the State's "send a message" argument was merely responsive to the defense's argument. If the State felt that the defense was improperly urging the jury to send a message that Leake County will not execute retarded people, then the proper response was a timely objection. It ought not to have responded by making its own "send a message" permutation, which we have repeatedly stated is inappropriate. *See, e.g.,* **Simon v. State**, 633 So. 2d 407, 413 (Miss. 1993) (Banks, J. dissenting) (noting that proper response to **Batson** violation is an objection, not retaliation with identical discriminatory conduct).

¶74. Beyond that, it is high time that the bench and bar take seriously our admonitions about such improprieties. Harmless error analysis should not be considered as a license to transgress the rules of fair argument that are repeatedly promulgated by this Court. The effect of the argument on this issue by the State in this appeal is an announcement that such license is what prosecutors and judges take our harmless error analysis of these issues to be. We should put an end to that.

¶75. For the foregoing reasons, I would affirm the conviction but reverse the sentence and remand for further proceedings.

**SULLIVAN, P.J., JOINS THIS OPINION.**

   **McRAE, JUSTICE, DISSENTING:**

¶76. Because the actions of the prosecutor in this case outside of the courtroom and during closing argument in the guilt and sentencing phases warrant reversal, I respectfully dissent.

¶77. First, the prosecutor in the trial below overstepped his bounds on the first day of the trial by engaging in an interview with television news media, explicitly violating Uniform Circuit and Chancery Court Rule 9.01. By allowing the interview to take place, the prosecutor gave "evidence" to the media regarding identification of the alleged murder weapon. This conduct is sanctionable.

¶78. Second, the prosecutor's closing argument to the jury in the guilt phase of the trial included a violation of the "Golden Rule," asking the jurors to put themselves in the place of one of the parties: "I couldn't call that anything but capital murder and I would venture to say that if it was your child you couldn't call it anything else either." Defense counsel immediately objected to this argument, and the trial judge overruled the objection. By making such an argument, the district attorney clearly aligned himself with the jury personally and tainted the jury with his personal opinion of how he would feel if his thirteen-year-old daughter were subjected to the same things as Gary Wells. *See Chisolm v. State* 529 So. 2d 635, 639 (Miss. 1988) (citing **Danner v. Mid-State Paving Co.**, 252 Miss. 776, 173 So.2d 608 (1965), for the proposition that an attorney cannot tell a jury to make its determination based on bias or personal interest in the civil or criminal context). The district attorney specifically made the argument to unjustly prejudice the jury. Further, the argument was highly significant in the overall context of this case, because the jury was being asked to make the initial determination of guilt or innocence.

¶79. Third, the prosecutor's statements during closing argument of the sentencing phase constituted an improper "send a message" argument. This argument in itself should be sufficient for reversal. Not only should the State not ask the jury to "send a message" to the county, the community, or society at-large, when deciding the punishment of the accused, but also the State's use of this type of summation is always improper and is reversible error. **Hunter v. State**, 684 So. 2d 625, 638 (Miss. 1996) (Sullivan, P.J., concurring in part and dissenting in part).

¶80. The cumulative effect of the errors by the district attorney requires reversal of Wells's conviction. Notwithstanding the prosecutorial errors, this Court is faced with insurmountable evidence of the defendant's guilt. However, the undoubtedly improper actions by the district attorney could very well have been the factors causing the jury to convict and impose the death penalty in this case. While no defendant is guaranteed a perfect trial, each defendant is guaranteed a fair trial. In addition, as the majority notes, the prosecutor's actions flew in the face of well-established court rules, as well as previous warnings from this Court.

> If a prosecuting attorney, who is presumed to know better, persists in making erroneous and prejudicial remarks in his argument before the jury, then the trial court should deal harshly with him to the extent of sanctions, reprimands and contempt. This Court will not look for some

reason to excuse such action of a prosecuting attorney, even though a new trial would be expensive to the people of the county. Such expenses, fault and blame should be placed at the door of the person who is responsible for it.

*Livingston v. State*, 525 So. 2d 1300, 1308 (Miss. 1988)(footnote and citations omitted). Further,

[i]t is not beyond the authority of this Court to assess the entire costs of a new trial to the attorney whose conduct made the trial necessary in those cases where [a reversal for unprofessional conduct] occurs. Personal liability for this cost may well be imposed by this Court in the future and it will be done with an even hand, applied both to the private attorney and the attorney representing the State.

*Stringer v. State*, 627 So. 2d 326, 330 (Miss. 1993). Accordingly, as a sanction, the costs of the appeal and preparation of the record should be assessed against the prosecuting attorney. Additionally, because of the combination of the improper interview and improper jury argument by the district attorney, this case should be remanded for retrial.

**BANKS, J., JOINS THIS OPINION.**

**APPENDIX**

**DEATH CASES AFFIRMED BY THIS COURT**

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi,* 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987)*, Jones v. Mississippi*, 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court,case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE

## <u>AND SENTENCE PHASE</u>

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

## DEATH CASES REVERSED AS TO GUILT PHASE

### AND SENTENCE PHASE

### (continued)

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

## DEATH CASES REVERSED

## AS TO PUNISHMENT AND REMANDED

### FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO

# PUNISHMENT AND REMANDED FOR A NEW TRIAL

# <u>ON SENTENCING PHASE ONLY</u>

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

***Shell v. State**, 554 So. 2d 887 (Miss. 1989), **Shell v. Mississippi**, 498 U.S. 1 (1990) reversing, in part, and remanding, **Shell v. State** 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

∗*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), **Pinkney v. Mississippi,** 494 U.S. 1075 (1990) vacating and remanding, **Pinkney v. State,** 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

***Clemons v. State**, 535 So. 2d 1354 (Miss. 1988), **Clemons v. Mississippi**, 494 U.S. 738 (1990) vacating and remanding, **Clemons v. State**, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

***Jones v. State**, 517 So. 2d 1295 (Miss. 1987), **Jones v. Mississippi,** 487 U.S. 1230 (1988) vacating and remanding, **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (Miss. 1996)

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

## DEATH CASES REVERSED AS TO

## PUNISHMENT AND REMANDED FOR A NEW TRIAL

## <u>ON SENTENCING PHASE ONLY</u>

### <u>(continued)</u>

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).

* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.